David NEAL et ux *v.* Cleo JACKSON

CA 80-435                                              616 S.W. 2d 746

Court of Appeals of Arkansas
Opinion delivered May 27, 1981
[Rehearing denied July 1, 1981.]

*L. T. Sims, II*, for appellants.

*Charles P. Allen*, for appellee.

LAWSON CLONINGER, Judge. This appeal questions the validity of a deed executed by Albert Neal and his wife, Mary Neal, and a will executed by Albert Neal, on January 8, 1976. Mary Neal died on February 28, 1976, at the age of 81, and Albert Neal died on June 26, 1976, at the age of 91. The chancery court action seeking to set aside the deed and the

probate court action seeking to set aside the will were consolidated for trial.

The appellee, Cleo Jackson, is the grantee in the contested deed and is the principal beneficiary under the terms of Albert Neal's will. Appellant David Neal, the natural son of Albert Neal, and Daisy Neal, the wife of David Neal, filed actions to set aside the deed and the will on the grounds that Albert Neal and Mary Neal were mentally incapable of executing the instruments, and that they were subject to fraud and undue influence exercised by Cleo Jackson.

The trial court held that Albert Neal was mentally capable of making the will and the deed; that there was no fraud or undue influence exercised by Cleo Jackson; and that it was not necessary to determine the competency of Mary Neal, because title to the land was in Albert Neal alone, and therefore when Mary Neal predeceased Albert Neal any rights in the property which Mary Neal might have had by dower or homestead expired. The petition of appellants to set aside the deed and the will were dismissed by the trial court.

For reversal, appellants argue that (1) The will of Albert Neal was not executed according to Arkansas law; (2) The court erred by not setting aside a dismissal of appellants' petition to set aside the deed; (3) Albert and Mary Neal lacked mental capacity to make a deed or a will; and (4) They were subjected to undue influence and fraud.

We find no merit in appellants' arguments as to points 1 and 2, but we must reverse the decision of the trial court as to points 3 and 4.

Appellants, for their first point, argue that the will of Albert Neal was not properly executed because the person who wrote Albert Neal's name near Albert's mark did not sign as a witness to the signature. Ark. Stat. Ann. § 60-403 (Repl. 1971) provides:

Execution. The execution of a will ... must be by

the signature of the testator and of at least two (2) witnesses as follows:

a. The testator shall declare to the attesting witnesses that the instrument is his will and either ...

(3) Sign by mark, his name being written near it and witnessed by a person who writes his own name as witness to the signature ...

Neither Ark. Stat. Ann. § 60-403, *supra*, nor the holding in *Green* v. *Smith*, 236 Ark. 829, 368 S.W. 2d 280 (1963), relied upon by appellants, requires that the person who writes the name of the testator near his mark must also sign as a witness to the signature or as a witness to the instrument itself. In this case there were two witnesses to the mark of the testator, and merely because neither of these witnesses wrote the testator's name near his mark is of no consequence.

Appellants, for their second point for reversal, urge that the trial court should have set aside the Rule 10 dismissal of appellants' petition to set aside the deed executed by Albert and Mary Neal to Cleo Jackson. The petition was filed on November 18, 1976. The Uniform Rules for Circuit and Chancery Courts, Rule 10, provides that a court docket may be cleared of any case upon which no action has been taken for one year. Dismissal is specified to be without prejudice. Pursuant to Rule 10, appellants' petition was dismissed on October 13, 1978, and appellants, on October 31, 1979, alleging justifiable cause, moved to reinstate the petition. The trial court found in the case now before the Court that the Rule 10 dismissal was with prejudice, thus barring any further proceedings in this case. The trial court, however, held that notwithstanding the dismissal, the court would make a determination of the petition on its merits. The trial court should have held that the Rule 10 dismissal was without prejudice to another action, but inasmuch as the court heard and decided the petition to set aside the deed on its merits, and none of the parties objected to the court's actions, the trial court's action is approved.

The questions of mental capacity and undue influence,

points 3 and 4 relied upon for reversal by the appellants, are so closely interwoven that they will be considered together. In *Phillips* v. *Jones*, 179 Ark. 877, 18 S.W. 2d 352 (1929), the Court said:

> As we have said, the questions of testamentary capacity and undue influence are so interwoven in any case where these questions are raised that 'the Court necessarily considered them together (*St. Joseph's Convent* v. *Garner*, 66 Ark. 623, 53 S.W. 298), for in one case where the mind of the testator is strong and alert the facts constituting the undue influence would be required to be far stronger in their tendency to influence the mind unduly than in another, where the mind of the testator was impaired, either by some inherent defect or by the consequences of disease or advancing age ... The facts constituting undue influence largely depend upon the condition of the mind of the person alleged to have been influenced. It has been said in the case of *Kelly's Heirs* v. *McGuire*, 15 Ark. 555, that if one is of such great weakness of mind as to be unable to resist importunity, and his act is not that of a judgment deliberatedly exercised, but the result of the control of a stronger mind by any means or artifice, cunning or fraud, that act is void.

The totality of the circumstances leading up to and culminating in the execution of the deed and the will in the case before the Court has to be examined before a picture emerges, and it will be necessary to set out those circumstances in some detail.

David Neal was the son of Albert Neal and Ernestine Ellaby. David's parents were not married, and in 1950 when David was four months old he was sent to live with Albert Neal and Albert's wife, Mary. David lived with Albert and Mary Neal continuously from 1950 to December 13, 1975, at which time Albert and Mary Neal moved out of their home and went to live in a house trailer parked behind the residence of appellee. It is virtually undisputed that David was Albert's son, and that Albert and Mary Neal gave David their name and treated him as a son. David and Daisy Neal

were married in 1971, and after that time David and Daisy lived with Albert and Mary. Daisy did the cooking and cleaning for the family, and paid most of the bills; David took care of the livestock on the farm and he also had a job. David testified that Albert and Mary Neal promised him all they had if he would stay and take care of them, which he did. Albert and Mary Neal executed a deed to David Neal for one-half acre of land in 1971, and in 1974 a new brick house was built on the one-half acre. The deed to David Neal recited in the consideration clause that the deed was given because of "the love and affection we hold for the grantee, our grandson." A thirty-year mortgage for $13,500 was given to finance the house, signed by Albert and Mary Neal, and by David and Daisy Neal.

Mary Neal had a light stroke early in December, 1975, and was treated in her home by a physician. On December 8, 1975, Mary Neal became convinced that David and Daisy Neal had taken one of her deeds, an abstract, and $1,500. Daisy Neal testified that Cleo Jackson told Mary Neal that Daisy Neal took the items and the money, but this is denied by Cleo Jackson. An unidentified person called the sheriff and reported the theft. David and Daisy Neal were taken to the sheriff's office and questioned, where it was discovered that the money was still in the bank, and David and Daisy Neal were cleared. Cleo Jackson took Mary Neal to the sheriff's office that same day, and then took Mary Neal to an attorney's office where Mary Neal discussed the making of a deed and a will. On December 10, 1975, Cleo Jackson took Mary Neal to West Memphis, where she selected a house trailer and bought it. Mary Neal paid $1,000 on the purchase price and Cleo Jackson paid $500. A promissory note in the sum of $3,300 was signed by Albert and Mary Neal and Cleo Jackson for the balance of the purchase price. On December 13, 1975, Albert and Mary Neal moved out of their house and into the trailer, which had been placed immediately behind Cleo Jackson's house. On January 6, 1976, Cleo Jackson took Albert and Mary Neal to Dr. Daniel Toneyman's office and obtained a certificate from Dr. Toneyman that Albert and Mary Neal were competent to transact their affairs.

About 8:00 a.m. on January 8, 1976, Albert and Mary

Neal executed instruments styled joint or reciprocal wills "in reliance upon our mutual agreement to dispose of our respective property . . ." Albert's will provided that Mary was to take everything if she survived him; in the event she predeceased him, he devised to David Neal his house and the half acre on which it is located; all the remainder of his property was devised to Cleo Jackson. The will recited that Albert Neal was that date selling Cleo Jackson his land, and the will provided that if any portion of the purchase price of the land was owing at Albert's death, the unpaid balance should be cancelled. The will recited that he and Mary had not had any children; that they had raised David Neal, but had not adopted him; that they loved him and wanted to provide for him to a certain extent. Mary Neal's will is identical to that of Albert Neal's. At the same time, Albert and Mary Neal executed a deed to their thirty-six acres of land to Cleo Jackson for a consideration of $9,000, $2,000 of which was paid, and the balance to be paid at the rate of $1,000 annually.

The instruments were executed in the house trailer of Albert and Mary Neal. The attorney who prepared the instruments was present, as were Cleo Jackson, his son, his daughter, and five others who had been brought there for the purpose of witnessing the execution of the instruments. The witnesses were friends of Cleo Jackson, and were picked up and brought to the house trailer by Cleo Jackson and his son. The group was there for more than an hour, and Albert was seated in a chair near the bedroom of the trailer. Mary was in bed. The attorney read the wills, pausing on occasion to ask Albert and Mary if they understood; the attorney said that Albert nodded twice in acknowledgment, but the other witnesses did not observe that. Neither Albert nor Mary said the instruments were their wills, nor did they ask the witnesses to be witnesses. Albert and Mary Neal made their marks, the attorney wrote the name of each by the marks, and the marks were witnessed. The attorney testified that Albert and Mary Neal were aware of what they were doing. Mary Butcher, age 83, a friend of the Neals as well as a friend of Cleo Jackson, testified that Mary's mind was all right; when she was asked if Albert's mind was clear that day she gave no answer. Mary Neal had a conversation with Mary Butcher

the day the instruments were executed, but the only time Albert spoke was to ask one of the witnesses if he was the son of an old acquaintance of Albert's. The witnesses testified that Albert and Mary Neal "touched the pencil, the pen, and made an X." They stated that the attorney made it very plain that they were witnesses that they touched the pencil and made the X.

On January 12, 1976, Mary Neal was hospitalized, suffering from arteriosclerotic heart disease, congestive heart failure, dehydration and malnutrition. She was admitted to the hospital again in February, 1976, suffering from heart failure and chronic brain syndrome. She died on February 28, 1976. Albert Neal went to Chicago in April to live with Mary Neal's niece, and he died there on June 26, 1976.

The evidence relating to the mental competence of Albert and Mary Neal is in conflict. Dr. Daniel Toneyman had been their physician for several years before their deaths, treating them both for high blood pressure and enlarged hearts, and examined them two days before the instruments were executed; however, Dr. H. B. Oldham treated Mary Neal on January 12, 1976, four days after the execution of the instruments, when Mary Neal was admitted to the hospital in a "state of semicomatose, very malnourished." Dr. Oldham stated that the malnourishment would have had to have been present for at least several weeks. Mary Neal was treated again by Dr. Oldham on February 6, 1976, when she was hospitalized again in a state of coma; her temperature was 95° and she was almost frozen; the doctor testified that she was at the time 81 years old, senile, and suffering from chronic brain syndrome; he testified that at all times when he treated her, she was not responsible for her actions.

A number of old friends of Albert and Mary Neal testified, and their testimony was in conflict. There was evidence that Albert and Mary Neal did not even acknowledge their presence. There was evidence that Albert and Mary Neal stopped going anywhere, even to church, several years before their deaths; that Mary Neal didn't want to leave Albert because Albert didn't think well, and that she had to

take care of all the business. There was also evidence that Albert denied selling his land after the deed was given. Other friends testified that Albert and Mary Neal were aware of what was going on, and were as alert as others their age. As is usually the case, the people who saw them daily have a vital interest in the outcome of this case, and their testimony has to be weighed accordingly.

David and Daisy Neal testified that Albert and Mary Neal were unable to help with any of the work around the house and farm the last ten years of their lives; that Albert was like a baby, and that when he went to the bathroom alone he would use the bathtub, thinking it was the commode. Cleo Jackson stated that Albert and Mary Neal were aware of their property and what they wanted to do with it; that they were able to do things for themselves, and that he did not influence them in anything they did; that he, Cleo Jackson, was not really aware of what the will provided for, although he was executor, at the time of the trial.

The rule for testing undue influence was laid down in the early case of *McCulloch* v. *Campbell*, 49 Ark. 367, 5 S.W. 590 (1887), and the rule has been restated in many subsequent cases:

> [T]he fraud or undue influence, which is required to avoid a will, must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property. And the influence must be specially directed toward the object of procuring a will in favor of particular parties ...

Undue influence may be inferred from facts and circumstances. *Alford* v. *Johnson*, 103 Ark. 236, 146 S.W. 516 (1912). In *Hyatt* v. *Wroten*, 184 Ark. 847, 43 S.W. 2d 726 (1931), the Court stated:

> [Undue influence] is generally exercised in secret,

not openly ... its sinister and insidious effect must be determined from facts and circumstances surrounding the testator, his physical and mental condition as shown by the evidence, and the opportunity of the beneficiary of the influenced bequest to mold the mind of the testator to suit his or her purposes.

The burden of proving undue influence, incompetence and fraud which will defeat a will is on the party contesting the will. *Thompson* v. *Orr's Estate*, 252 Ark. 377, 479 S.W. 2d 229 (1972). However, in the case of *Short* v. *Stephenson*, 238 Ark. 1048, 386 S.W. 2d 501 (1965), the Court stated that there was a rebuttable presumption of undue influence in the case of a beneficiary procuring the making of the will, and that the proponent of such a will must show *beyond a reasonable doubt* that the testator had both the required capacity and the freedom of will to make the will valid.

The will of Albert Neal provided that "... I give, devise and bequeath to David Neal, whom we have raised, our house and the one-half acre on which it is located ..."

The trial judge, in a memorandum opinion written to the attorneys for the parties, made this observation:

It must be further noted that Albert did not leave David out of his will altogether, but made what amounts to a fairly substantial provision for him. This indicates to the Court that Albert weighed the circumstances surrounding the making of the will, and came to a decision about them which he found to be satisfactory. If Albert were competent to do this (and we have found that he was), then the law gives him full leeway to do what he did. Our law does not require a testator to give preference to his blood relatives, to the exclusion of friends. We must only be careful to ascertain that the testator makes this selection free from any tainted influence. We find that Albert did so in this case.

The fact is, Albert Neal left nothing to David Neal in his will, because the house was built on the one-half acre which

he and Mary had deeded to David Neal in 1971, and the devise of the one-half acre and the house was the only provision made for him in the will. The devise casts doubt upon the awareness Albert and Mary had as to the extent of their property. Testamentary capacity means that the testator must be able to retain in his mind, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and relations of those entitled to his bounty. *Hiler* v. *Cude*, 248 Ark. 1065, 455 S.W. 2d 891 (1970). *Short* v. *Stephenson, supra.*

Procure means to cause a thing to be done, to bring about. There is evidence in abundance that Cleo Jackson procured the wills and the deed of Albert and Mary Neal. He was present and active at every stage of the events leading to the execution of the wills and the deed; when Mary Neal thought that David and Daisy Neal had taken her property, Cleo Jackson was at their house, and it was Cleo Jackson who took Mary Neal to the sheriff's office and then directly to the attorney's office to discuss the making of the will; two days later Mr. Jackson took Mary Neal to West Memphis to select a house trailer, and he not only paid $500 down on the trailer, he also signed a promissory note for the balance due. Mr. Jackson took Albert and Mary Neal to Dr. Toneyman's office to obtain a certificate of competency two days prior to the execution of the wills and deed; Mr. Jackson made the arrangements for the witnesses to be present for the signing of the wills and deed, and he and his son picked up the witnesses and brought them to Albert and Mary's trailer. Cleo Jackson was the procurer of the instruments, and he was the sole beneficiary under the terms of the will. As a procurer and beneficiary he was required by the rule enunciated in *Short* v. *Stephenson, supra*, to show beyond a reasonable doubt that Albert Neal had both the required capacity and the freedom of will to make the wills and deed valid. This he has failed to do.

The disposition of this property made by Albert Neal in his will was not a natural one. David Neal was Albert's natural son, and had been treated as a son by both Albert and Mary. They had sufficient love for him in 1971, at a time when Albert was 86 years old, to deed to him the one-half

acre upon which their home was located, describing David in the deed as their grandson, and in 1974, when Albert was 89 years old, they built a new brick home on David's land. Until about December 1, 1975, soon after Mary Neal suffered her first stroke, there was no evidence of disharmony in the family. Cleo Jackson was a neighbor and friend who owned 400 acres of land a short distance from the Neal farm.

The medical evidence presented in this case for the most part concerned the competence of Mary Neal. There was testimony to indicate that she was more active than Albert for the last few years of their lives, but she had more illness requiring hospitalization and the attendance of a doctor. Although Dr. Toneyman testified that she was competent to transact her business affairs, Dr. Oldham found her to be suffering from heart disease, hypothermia, chronic brain syndrome, and senility, within less than thirty days after the execution of the contested instruments, and his opinion was that in all probability she was suffering from those conditions in December, 1975. This Court is aware that the validity of the instruments executed by Mary Neal are not in contention here, and that her competence and vulnerability to undue influence are to be considered only as they may reflect on Albert's competence and freedom of will. The wills executed by Albert and Mary are self-styled "joint and reciprocal," and it is evident that Mary often took the lead in their joint actions; Mary alone went with Cleo Jackson to first discuss the making of the wills and deed, and Mary alone went to West Memphis with Cleo Jackson to buy a trailer. The mental and physical condition of both Albert and Mary was such that they were susceptible to undue influence.

We hold that the decision of the trial court was clearly against the preponderance of the evidence and that the petitions of the appellants to set aside the will of Albert Neal and the deed of Albert should have been granted by the trial court.

Evidence was presented in the trial court indicating that appellee has made improvements on the land purported to be conveyed by the deed. He is entitled to a lien on the land to secure the payment of the value of the improvements and

taxes he has paid. Ark. Stat. Ann. § 34-1423 (Repl. 1962). The rule for establishing the value of improvements was set out in *Wallis* v. *McGuire*, 234 Ark. 491, 352 S.W. 2d 940 (1962), and approved in *Williams* v. *Jones*, 239 Ark. 1032, 396 S.W. 2d 286 (1965), as follows:

> The measure of the value of betterments is not their actual cost, but the enhanced value they impart to the land, without reference to the fact that they were desired by the true owner, or could not be profitably used by him.

The decree is reversed and the cause remanded to the trial court with directions to permit the taking of proof relative to the value of the improvements made by appellee.

CRACRAFT, J., not participating.