Colleene B. PARK, Margaret B. "Polly" SMITH,
W. T. BUCK, Sr. and Malcolm BUCK *v.*
Conway GEORGE, Personal Representative of the
Estate of Myrtle ROGERS

83-292                                        667 S.W.2d 644

Supreme Court of Arkansas
Opinion delivered April 2, 1984
[Rehearing denied May 7, 1984.]

*Wilson, Engstrom & Vowell,* for appellants.

*Lightle, Beebe, Raney & Bell,* for appellee.

JOHN I. PURTLE, Justice. The probate judge for Prairie County admitted a will to probate over appellants' objections that it was procured by undue influence and that the testator lacked mental capacity. Appellants argue here that: 1) the court erred in not shifting the burden of proof; 2) the court erred in allowing an expert witness to testify; and 3) the trial court's findings were clearly erroneous. We agree that the court erred in placing the burden of proof on the contestants thereby creating prejudicial error. Since the case was fully developed and we review it de novo we hold the will to be invalid.

Myrtle Rogers was 88 years of age when she executed the will here in question, on July 22, 1982. This date was her second day in the hospital. She died on August 4, 1982, and a petition to probate her will was filed on the same date. The case was heard by the probate judge on April 26 and 27, 1983. The weight of the testimony and evidence presented at the trial is the subject of this appeal.

W. B. "Buster" Guthrie and James Thweatt were associated in the practice of law. They prepared the will and procured its execution. Guthrie was a beneficiary in the will in the amount of $10,000. On the day the will was executed the attorneys obtained a check from the decedent in the amount of $7,000 for the purpose of, among other things, defending the will in a court contest which was expected. Also, Guthrie had been the recipient of a previous $7,000 check from the appellant which was a gift to him for making a down payment on a house. In addition to the above Guthrie received $5,000 for the purchase of a copying machine to copy certain abstract of title records. The records were never copied and Guthrie kept the machine. During the three years preceding decedent's death Guthrie had collected at least $19,500 in attorney's fees in addition to the items above mentioned. Guthrie so controlled the decedent's life that he determined whom she would be allowed to see and visit with and who would not be allowed in her presence. He obtained a restraining order against Colleene Park, Malcolm Buck, W. T. Buck, Sr. and others to prevent them from seeing the decedent. This was done before he took decedent from the psychiatric ward at St. Vincent's Infirmary in Little Rock without authorization by the attending physician. Guthrie had been named as a beneficiary in one or more of the previous wills, including the one dated November 20, 1981, which was the last one before the one here under consideration. He also represented the decedent in two prior actions in which some of the appellants sought to have a guardian appointed for her on the grounds of senility or other mental incapacity. In one case, P-82-15, Dr. J. T. Williams, Jr., M.D., executed an affidavit in favor of appointing a guardian. Dr. Williams stated that Myrtle Rogers was unable to take care of herself or to manage her financial affairs. He stated she suffered from cerebral arterial

insufficiency and certain other disease processes, including arteriosclerosis and the aging process. The affidavit was filed on July 12, 1982, ten days prior to the execution of the will under consideration.

Dr. Williams testified at the trial that he thought the testator was competent to execute the will dated July 22, 1982; that he had been her physician for 25 years; that he did not observe any mental confusion on the part of the testator at noon on the day she executed the will; that she had been given morphine about 5:00 a.m. the same day; and that the reason he executed the affidavit to have a guardian appointed for the decedent was because he thought she should not live alone.

Witnesses who observed the testator at the hospital during her final stay generally stated she was rational part of the time. On the day the will was executed Colleene Park and two other appellants tried to visit her in the hospital but were told by the nurse they could not see her. Park stated they talked to Dr. Williams at the hospital about 1 p.m. and he told them the decedent was heavily sedated and he would not even allow an attorney to visit her. The medication nurse at Mercy Hospital, who was on duty on the day the will was executed, stated she observed the decedent between 5 and 6 p.m. on July 22, 1982, and that the decedent had pulled the I.V. from her arm and removed the heart monitor electrodes attached to her body. The nurse said she helped get her back into the bed but that the testator kept asking, "Have I signed something that I shouldn't have?" The testator appeared very upset and confused. This nurse refused to be a witness to the execution of the will. Finally, it was her opinion the decedent was oriented about half of the time.

Nurse supervisor Roberts testified that decedent was out of touch with reality while she was hospitalized in July of 1982. He thought there were periods of time when she may have been lucid but such periods lasted only five or ten minutes. Immediately after the will was signed she seemed alert but later on the same afternoon she was out of her bed after disconnecting the I.V. and heart monitor. It was at this time that she kept asking, "Have I signed something I

shouldn't?" Late in the afternoon or early evening she had to be quieted with demerol. At 7:00 p.m. she was quieted and resting. He thought she was mentally confused and out of touch with reality during most of the time she was in the hospital.

None of the testimony of witness Roberts was heard by Dr. Doug Brown, who later testified that the testator was competent during this period of time.

Dr. Doug Brown was allowed to testify over the appellants' objection on grounds that it would be unfair because he had not heard the direct testimony of witness Roberts. In essence Dr. Brown testified that he thought there was no basis from a psychological perspective to consider Myrtle Rogers incompetent as psychologist Dr. Douglas Stevens had done.

Dr. Stevens, a clinical psychologist, went to a nursing home in Des Arc on June 11, 1982, for the purpose of testing the testator's competency. He gave her certain tests and reviewed her medical history, including nursing notes indicating she was "crying, wandering, incontinent, soiled herself with feces, and later had a large bowel movement on the floor." Dr. Stevens recommended that she be transferred to St. Vincent's Infirmary and this was done. It was shortly after this when attorney Guthrie by his own authority took her out of St. Vincent's. Stevens spent about six hours with her on June 11, but she did not recognize him the next morning. The nurses at St. Vincent's indicated the testator would get lost between the nurses' station and her room which was three doors away. Dr. Stevens concluded she was senile, had a child-like behavior, had an I.Q. of 94, and was out of touch with reality. He stated: "At no time did her lucidity even begin to approach that level that would be necessary for competence in the real world . . ." It was his opinion that she did not have the requisite mental capacity to execute a will on July 22, 1982.

Various relatives and friends testified as to the testator's condition. Their descriptions of her condition ranged from fully alert to completely disoriented. Without detailing

more testimony it is fair to state the other testimony was about equally divided with perhaps the most of it indicating the decedent was generally incompetent.

During the trial the court held that it was the duty of the contestants to prove that the decedent did not have the requisite legal capacity to execute this will. At commencement of the trial the proponents' attorney stated it was his duty to present the will and the witnesses to the will before the burden shifts. The court agreed and contestants' attorney stated he had no objection to letting the proponents' witnesses go until the next day. There was a stipulation that the testatrix had executed a previous will on November 20, 1981.

Appellants first argue the court erred in placing the burden of proof on them. They argue that after it was shown that the attorney preparing the will was the beneficiary of a $10,000 bequest the presumption that the will was invalid arose and it became the burden of appellee to prove the will was not a result of undue influence and that the testatrix was mentally competent. The will named Thweatt and Guthrie as attorneys to represent the estate and they were paid $7,000 in legal fees at the time she executed the will. Two of the primary beneficiaries of the will were represented by Thweatt at that time. The two witnesses to the will were secretaries for the lawyers. The four persons connected with the law offices in Des Arc and Hazen were present in the hospital room in Brinkley when the will was executed. Myrtle was awakened from her sleep by Guthrie and she signed the will without reading it after Guthrie read parts of it to her.

In *Greenwood* v. *Wilson*, 267 Ark. 68, 588 S.W.2d 701 (1979) we held that the proponent of a will who is a beneficiary and who drafted the will or caused it to be drafted has the burden to prove beyond a reasonable doubt that it was not the result of undue influence and that the testator had the mental capacity to make the will. We again held in *Smith* v. *Welch*, 268 Ark. 510, 597 S.W.2d 593 (1980) that where a beneficiary procures the making of a will, "it is incumbent upon those who, in such a case, seek to establish

the will, to show beyond reasonable doubt, that the testator had both such mental capacity, and such freedom of will and actions as are requisite to render a will legally valid." Uniform Rules of Evidence Rule 301 (a) speaks to presumptions and states that the party against whom the presumption is directed has the burden of proving the non-existence of the presumed fact is more probable than its existence.

At the time the will was executed Margaret George, one of the beneficiaries of the will, was a client of James Thweatt. He represented Margaret George in her efforts to get Bill Hall appointed guardian of the testatrix. Hall petitioned to be appointed guardian to handle decedent's affairs because he thought she was not competent to do so. Attorney Guthrie certified the answer of Rogers to the first petition for appointment. On the other hand Thweatt represented Margaret George on her petition to have Hall appointed guardian. It appears the two associated attorneys were on opposing sides until Guthrie had the decedent join in the Hall request for appointment as guardian. Either Margaret George or Bill Hall, another beneficiary, called Guthrie and reported testator's deteriorating condition. Guthrie stated he took Thweatt to the hospital to protect him from possible harm from appellants whom he had enjoined from visiting the decedent. Margaret George was at bedside when Guthrie awoke Myrtle Rogers from her sleep and read a part of the will to her. By this time Guthrie and Thweatt's two secretaries had arrived and became witnesses to the execution of the will. Margaret George's bequest was greatly increased at the expense of the appellants who had been named beneficiaries under the prior will. Neither the medical staff nor Dr. Williams were consulted prior to execution of the will.

The new will still contained the bequest to Guthrie. The share of Thweatt's clients was greatly increased and a fee of $7,000 was paid to the lawyers at the time the will was signed. Therefore, Guthrie was benefitted by the new will as were Bill Hall and Margaret George. Having procured the execution of the will they had the burden of proving beyond a reasonable doubt that the testatrix was not unduly

influenced and possessed the mental capacity to execute the will.

The court ruled from the bench that the opponents had failed to carry their burden of proof when it stated:

> I don't think there is any question that the contestants of the will do have the burden of proof that Myrtle Rogers did not have the requisite legal capacity to execute the will . . . and the will will be admitted to probate.

Even though the court erroneously placed the burden of proof as to undue influence and requisite mental capacity upon the opponents of the will the testimony was all entered into the record. In reaching this conclusion we have necessarily decided the proponents of the will procured its execution or were beneficiaries thereunder. Therefore, the will under consideration is declared void.

Reversed.

ADKISSON, C.J., SMITH, GEORGE ROSE, J., and HICKMAN, J., dissent.

DARRELL HICKMAN, Justice, dissenting. The majority has succumbed to the temptation to retry this case. The fact that we review a case *de novo* from the probate court does not mean that we substitute our judgment for that of the judgment of the trial court. The legal argument made on appeal that the trial court applied the wrong legal standard regarding the burden of proof, was not presented to the trial court and is presented to us for the first time. I cannot say from the record what standard the trial court applied; therefore, I can only examine his findings to see if they are clearly wrong. ARCP Rule 52. I cannot say he was wrong from this record. There is an abundance of testimony that could be recited, if we were of a mind to, to justify upholding the probate judge's finding that the proponents of the will met their burden of proof. There was strong testimony that the testatrix was of sound mind, knew exactly what she was doing, and was not influenced in any way by those alleged to

have influenced her. The role of W. B. Guthrie is insignificant, because in either will he was to receive the same bequest.

ADKISSON, C.J. and GEORGE ROSE SMITH, J. join.