Jerry G. NOLAND and Anita Delores Shaver, Trustees of the Wesley E. Noland Irrevocable Trust, and Jerry G. Noland, Anita Delores Shaver, and Helen Lorraine Hooten, Beneficiaries of the Wesley E. Noland Irrevocable Trust *v.* Claude NOLAND

96-1555 956 S.W.2d 173

Supreme Court of Arkansas
Opinion delivered December 4, 1997

*Lingle Law Firm*, by: *James G. Lingle*, for appellants.

*Davis & Watson, P.A.*, by: *Charles E. Davis*, for appellee.

ROBERT L. BROWN, Justice. This case raises two issues: (1) whether the trial court erred in shifting the burden of proof to appellants Jerry G. Noland, Anita Delores Shaver, and Helen Lorraine Hooton in an undue-influence case for the reason that they were beneficiaries of a trust and procured its creation; and (2) if so, whether the appellants proved beyond a reasonable doubt that the settlor of the trust, Wesley E. Noland, was of sound mind and free of undue influence when he created the trust. The trial court found that Wesley Noland was of unsound mind and not a free agent when he executed the trust. Because we conclude that the trial court clearly erred in its finding, we reverse the court's order and remand for appropriate orders to be entered.

On January 21, 1974, Wesley E. Noland, and his wife, Elsie Noland, established by deed a joint tenancy with right of survivorship in eighty-five acres of farmland (the farm) located in Benton County. Under the joint tenancy, Wesley Noland, Elsie Noland, Jerry Noland, and Claude Noland each held an undivided interest in the farm. Subsequent to Elsie Noland's death in June 1990, Wesley Noland, Jerry Noland, and Claude Noland each held an undivided one-third interest in the remaining eighty-two-and-one-half acres.[1]

On September 27, 1991, at the age of 86, Wesley Noland created the Wesley E. Noland Irrevocable Trust and named Jerry Noland and one of his two daughters, appellant Anita Shaver, as trustees. Wesley Noland funded the trust by deeding his undivided one-third interest in the farm to the trust and by conveying all of his personal property located in his residence on the farm to the trust. That same day, Jerry Noland also deeded his undivided

---

[1] After the original conveyance, two-and-one-half acres were condemned for the construction of a state highway.

one-third interest in the farm to the trust. The trust instrument provided that the trust would care for Wesley Noland for the balance of his life, and upon his death, the remainder of the trust property was to be distributed, in equal shares, to Jerry Noland, Anita Shaver, and his remaining daughter, appellant Helen Hooton subject to Claude Noland's life estate in part of the property. The trust provided that in the event Wesley Noland predeceased Claude Noland, Claude Noland would receive a life estate in the residence, barn, and corral located on the farm. The effect of the trust's creation and the two deeds on Jerry Noland was that his undivided one-third interest in the farm with right of survivorship to the whole was converted into a two-ninths interest in fee, as a beneficiary of the trust. Anita Shaver and the remaining daughter, Helen Hooton, would also be beneficiaries of a two-ninths interest in the farm, subject to the two life estates. Wesley Noland died on August 12, 1992.

On January 29, 1993, Claude Noland filed a petition to set aside the trust and warranty deed executed by his father. The petition alleged that Wesley Noland lacked the mental capacity to execute the trust and warranty deed and that he was unduly influenced by Jerry Noland and Anita Shaver because they caused the trust and warranty deed to be prepared and took their father to an attorney for the purpose of signing the documents. The petition also alleged that the conveyance was invalid because his father only owned an undivided one-third interest in the farm as a joint tenant with right of survivorship and that he could not destroy the joint tenancy.

On September 20, 1994, after hearing a considerable amount of conflicting testimony on the subject of undue influence and Wesley Noland's mental capacity, the trial court issued its order. The court found that Jerry Noland caused the irrevocable trust and deed to be prepared and, because of this, the burden shifted to the appellants to prove beyond a reasonable doubt that Wesley Noland had the mental capacity and free will to execute the trust and warranty deed. The court then stated:

> Though the testimony is in considerable dispute, there is certainly evidence to indicate that Wesley's physical strength and

mental condition were such as to put folks who knew him on notice that he had some problems both mentally and physically.

> The Court is of the opinion that the defendants Jerry Noland and Anita Shaver are fine people, fine citizens and probably did not set out to procure the making of the trust and warranty deed, but in my opinion, in view of the law cited above, it must be found that the defendants did not carry their burden of proof by showing beyond a reasonable doubt that Wesley had both such mental capacity and such freedom of will and action as are requisite to render the trust and warranty deed legally valid.

The court concluded that the trust and warranty deed executed by Wesley Noland should be set aside.

The Court of Appeals affirmed the trial court's order by a tie vote. *Noland v. Noland*, 55 Ark. App. 232, 934 S.W.2d 940 (1996). We granted appellants' petition to review pursuant to Ark. Sup. Ct. R. 1-2(e)(i).

## I. Mental Capacity

Because we reverse this case on the basis of Wesley Noland's mental capacity and free agency, we need not address the issue of whether the burden of proof was improperly shifted to the appellants. We assume for purposes of this analysis, as the trial court found, that at least one of the appellants, Jerry Noland, procured the Wesley E. Noland Trust and that the appellants all benefitted from this procurement. With this assumption, a presumption that the trust was the result of undue influence arises under our caselaw and the burden of proof then shifts to the proponents of the trust to prove beyond a reasonable doubt that Wesley Noland had both the mental capacity and freedom of will to render the trust legally valid. *See Looney v. Estate of Wade*; 310 Ark. 708, 839 S.W.2d 531 (1992); *Rose v. Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984); *Park v. George*, 282 Ark. 155, 667 S.W.2d 644 (1984); *Abel v. Dickinson*, 250 Ark. 648, 467 S.W.2d 154 (1971); *Short v. Stephenson*, 238 Ark. 1048, 386 S.W.2d 501 (1965); *Orr v.*

*Love*, 225 Ark. 505, 283 S.W.2d 667 (1955); *McDaniel v. Crosby*, 19 Ark. 533 (1858).[2]

■ The trial court concluded that the appellants did not meet their burden and specifically found that Wesley Noland "had some problems both mentally and physically." Thus, the issue for this court to decide on *de novo* review is whether the trial court's finding on mental capacity and undue influence was clearly erroneous. *Holaday v. Fraker*, 323 Ark. 522, 915 S.W.2d 280 (1996); *Welchman v. Norman*, 311 Ark. 52, 841 S.W.2d 614 (1992). We note in this connection that deference is generally accorded to the superior position of the chancellor to judge the credibility of the witnesses. *Holaday v. Fraker, supra; Riddick v. Street*, 313 Ark. 706, 858 S.W.2d 62 (1993).

■ We turn first to the proof offered by the appellants that Wesley Noland was mentally competent for purposes of executing the trust on September 27, 1991. In *Daley v. Boroughs,* 310 Ark. 274, 283-84, 835 S.W.2d 858, 864 (1992), this court discussed at length the test for determining mental capacity:

> The rule has been generally expressed that sound mind and disposing memory, constituting testamentary capacity, is (a) the ability on the part of the testator to retain in memory without prompting the extent and condition of property to be disposed of; (b) to comprehend to whom he is giving it; and (c) to realize the deserts and relations to him of those whom he excludes from his will.

> Testamentary capacity means that the testator must be able to retain in his mind, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and relations of those entitled to his bounty.

*Id.* (citations omitted), *quoting Hiler v. Cude*, 248 Ark. 1065, 1076, 455 S.W.2d 891, 897-98 (1970).

■ Complete sanity in the medical sense is not required if the power to think rationally existed at the time the will was

---

[2] We draw no distinction between the mental competency and free will necessary to execute either a will or a trust which takes effect, in part, at date of death. *Rose v. Dunn, supra*.

made. *Daley v. Boroughs, supra; Abel v. Dickinson, supra; Hiler v. Cude, supra.* Furthermore, our own law is clear that despite any mental impairment, the testator may execute a will if he is experiencing a lucid interval. *Daley v. Boroughs, supra; Hiler v. Cude, supra.* The time to look at a testator's mental capacity is at the time the will is executed. However, proof may be taken as to the testator's condition both before and after the will's execution as being relevant to his condition at the time the will was executed. *Daley v. Boroughs; Rogers v. Crisp,* 241 Ark. 68, 406 S.W.2d 329 (1966).

This court has upheld mental competency at the time of the execution of a will even in the wake of evidence of some mental deterioration. *See, e.g., Daley v. Boroughs, supra* (affirming trial court's finding of capacity despite medical records providing that testator was confused, disoriented, and needed to be restrained during the three days prior to the execution of the will); *Abel v. Dickinson, supra* (affirming trial court's decision to probate will made by an elderly testatrix; the attorney and her physician testified as to competence despite the fact her physical condition had been "going downhill" at the same time); *Thiel v. Mobley,* 223 Ark. 167, 265 S.W.2d 507 (1954)(reversing trial court's finding of a lack of capacity despite proof that testatrix was often under the influence of opiates that she had been taking in connection with pain from cancer). *But see, e.g., Short v. Stephenson, supra,* (reversing trial court's finding of competency when, months prior to execution of the will, testator failed to recognize his only living relative on one occasion and developed problems with his memory).

In reaching our decision in this case, three pieces of evidence seem particularly significant. The first is the deposition testimony of Dr. John Huskins, Wesley Noland's physician at Rogers Memorial Hospital, who opined that Wesley was mentally competent on September 27, 1991, because he had sufficient mental capacity to know the extent and condition of his property; to know his children; and to know that he was disposing of his property to them. Secondly, on September 7, 1991, Jerry Noland videotaped an interview with his father, during which time Wesley Noland identified his four children and expressed a desire that

each child share equally in his farm property. Wesley Noland also stated that he would be willing to sign a new deed that would give his daughters, Anita Shaver and Helen Hooton, an interest in the farm, and that he would not have signed the 1974 deed had he understood that they would never receive any interest. He further stated that he wanted Jerry Noland to disburse the funds taken from his bank account and his certificates of deposit equally among his children after his death.

Finally, Jerry Noland videotaped Wesley Noland's execution of the trust and deed on September 27, 1991, in the lawyer's office. Jerry Noland testified that he contacted an attorney, Ernest Lawrence, and that he received a copy of the trust and deed directly from Lawrence's law office. He then explained the documents to his father before the September 27, 1991 meeting. Ernest Lawrence also testified that he prepared the trust and deed in question and that he had had no contact with Wesley Noland prior to September 27, 1991. However, after interviewing Wesley Noland on that date, he concluded that Wesley Noland possessed the requisite mental competency and free will to execute the documents.

The following colloquy between Ernest Lawrence and Wesley Noland on September 27, 1991, as abstracted by the appellants, is illustrative of Wesley Noland's mental ability and understanding at the time he executed the trust and deed. After Wesley Noland identified his children for the lawyer, the interview continued:

> LAWRENCE: What we're doing today, Mr. Wesley, is how we can figure out — how we can get the girls included. Now is that what you want to do?

> WESLEY: Yes. I want every kid to have its part, whatever is coming to them.

> . . . .

> LAWRENCE: What kind of property do you have, Wesley?

> WESLEY: I own 82 1/2 acres, I guess. The road over here took out 2 1/2 acres. I had 85 acres. But there was more than that. I borrowed the money off you and somebody else to get that. That's where I stay.

. . . .

> I told you that I remember signing that deed sometime back but that I really didn't realize what I was doing. We discussed that the deed placed title to the 82 1/2 acres in the names myself and my two sons. There was 85 whenever I signed that. That really was not what I wanted to have happen. I want my kids to have equal share after I'm gone from here.

Other questioning by the lawyer emphasized that Claude Noland would keep his undivided one-third interest in the farm and that the remaining two-thirds interest in the trust would be used for the care and benefit of Wesley Noland for life. He further explained that Claude Noland would have a life estate in the home, barn, and corral after his father's death. Wesley Noland indicated that he understood the basic arrangement and reiterated that he wanted his two daughters to share in the farm.

On the other hand, Claude Noland challenges his father's competency and points to the fact that Wesley Noland signed the first copy of the trust agreement as "Wesley E. Wesley." He also testified that on the evening of September 27, 1991, his father told him he had made out a "will" that day. In addition, Wesley Noland apparently told his brother, Austin Noland, during this same time period that he did not know what he had signed.

Much testimony was presented by both parties about Wesley Noland's actions before and after he signed the trust as bearing on the soundness of his mind. Claude Noland, for example, testified to numerous events that, to his mind, brought his father's mental capacity into question. A compendium of those events follows: Wesley Noland would leave the water hydrant running and forget to water the dogs; he once purportedly caught himself on fire while attempting to thaw out a frozen water tank in 1989; he had difficulty dialing telephone numbers properly in connection with the family business for the last five to seven years of his life; he would wander off and be found alone in the woods or sitting by the road; he would forget to turn off the burners on the stove after making oatmeal or coffee; he would do laundry at 2:00 in the morning; he expressed a desire to be with another woman during his wife's funeral; and he would urinate in the front yard in front

of passing vehicles. Claude Noland also testified that he found feces on the bathroom floor in August or September 1991 and that his father had difficulty dressing himself. On cross-examination, Claude admitted that he believed his father spent too much time gambling and playing dominoes in the local pool hall and not working.

Other witnesses, including a home-care nurse, confirmed that Wesley Noland had proposed marriage to them following his wife's death. Some witnesses confirmed that he would wander off looking for Claude and that he often repeated himself and once told a tale about wild dogs being in the area.

The appellants countered with testimony about Wesley Noland's sound mind. Neighbors who brought lunch to Wesley Noland after his colon surgery in December 1991 testified to his mental competency and to the fact that Claude verbally abused his father. Appellant Helen Hooton recorded on audiotape one occasion when Claude appeared to be cursing his father. Jerry Noland testified that Wesley Noland was interested in conveying an interest in the farm to his two daughters as early as the mid-eighties. Because of this, he and his two sisters contacted an attorney, John Scott, in 1984. Anita Shaver confirmed this and stated that John Scott told them nothing could be done to sever the joint tenancy created in 1974 without Claude Noland's involvement.

We begin by focusing on the date of execution of the deed and trust, which was September 27, 1991. On that date, it is clear, as the videotape substantiates, that Wesley Noland knew his property and his heirs and further knew that he was signing documents to treat his children equally. *See Daley v. Boroughs, supra.* True, he may not have understood the niceties of the operation of a trust versus that of a will or precisely how the trust agreement would be carried out. His formal education was minimal; testimony was that he was not educated beyond the third grade. But we do not view those factors as evidence of an unsound mind. Nor do we consider the fact that he first signed his name in error as bearing on his lucidity. There is no question that at age 86 Wesley Noland was failing in some respects. Still, again, we are convinced that he knew he was taking steps to include his daugh-

ters as beneficiaries of the farm at the time of his death when he created the trust on September 27, 1991. Indeed, Claude Noland offers nothing to counter this pivotal point, other than to emphasize the laundry list of Wesley Noland's eccentricities.

■ We acknowledge that proof of Wesley Noland's condition before and after the trust's execution may be relevant to his condition at the time the trust and deed were signed. *Daley v. Boroughs, supra*; *Rogers v. Crisp, supra*. Nonetheless, proof of Wesley Noland's eccentric behavior and deterioration of his bodily functions do not equate to incompetency. Much of what was offered as evidence of incompetency falls more readily into the category of weakened faculties perhaps, but not unsoundness of mind. We are mindful in this regard of commentary in THOMPSON ON WILLS, which we have quoted in the past with approval:

> Mere age is not necessarily inconsistent with testamentary capacity. "Indeed, the mental faculties may be weakened and impaired by old age without destroying such capacity. The mere fact that an aged testator's memory is failing, or that his judgment is vacillating, or that he is becoming eccentric, or that his mind is not as active as formerly — these things do not invalidate his will if it was fairly made and he was free from undue influence. While age is not of itself a disqualification, yet it excites vigilance to see if it is accompanied with capacity." — THOMPSON ON WILLS, § 62, pp. 88–89.

*Pernot v. King*, 194 Ark. 896, 910, 110 S.W.2d 539, 545 (1937). Again, the videotaped event on September 27, 1991, manifestly depicts a man who essentially knew what he was doing in signing the documents. *Daley v. Boroughs, supra*; *Hiler v. Cude, supra*. As in the case of *Thiel v. Mobley, supra*, here there is a complete absence of proof that Wesley Noland was not lucid at the time he signed the trust and deed. In the *Thiel* case, as in the instant case, we reversed the trial court and upheld the will on grounds of both soundness of mind and free agency.

■ We conclude that the trial court clearly erred in finding that the appellants failed to establish soundness of mind beyond a reasonable doubt.

## II. Free Will

We turn next to the issue of whether the appellants met their burden of proof concerning Wesley Noland's free agency on September 27, 1991.

■ This court has stated that the questions of undue influence and mental capacity are so closely interwoven that they are sometimes considered together. *In Re Conservatorship of Kueteman,* 309 Ark. 546, 832 S.W.2d 234 (1992); *Rose v. Dunn, supra.* In *Orr v. Love, supra,* we described the requisite proof to establish undue influence:

> The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property.

*Orr v. Love,* 225 Ark. at 510, 283 S.W.2d at 670. *See also In Re Estate of Davidson,* 310 Ark. 639, 839 S.W.2d 214 (1992).

■ The converse of this is also true. For the appellants to prove free agency, they must show that Wesley Noland executed the trust and deed on September 27, 1991, without fear or coercion or any intimidation that would deprive him of free agency. The videotape of the signing of the instruments in the lawyer's office lasts approximately 45 minutes. It depicts Ernest Lawrence explaining in detail to Wesley Noland what is transpiring with the trust and deed and his steps to make certain that this is what Wesley Noland wants to do. Also present at the meeting in Lawrence's office are a staff person who witnessed the signing; Jerry Noland, who videotaped the session; and Anita Shaver. There is no question but that Jerry Noland and Anita Shaver contacted Ernest Lawrence about drafting the instruments, briefed their father on what would occur, and brought him to the lawyer on September 27, 1991. The issue for us to address, however, is not whether there were suggestions made to Wesley Noland by his heirs, but whether there was *undue* influence.

Viewing the videotape, we can ascertain nothing that denigrates Wesley Noland's freedom to act in Ernest Lawrence's office.

He appears to know what he wanted to accomplish — equality among his children, which meant including his daughters as heirs to the farm. Steps were taken to prove that everything was done according to Hoyle, with attorney explanations and a visual and audio record of what transpired. Moreover, this is not a case where a new will disinherits one heir and benefits others. Here, Claude Noland maintained an undivided one-third interest in the farm and acquired as well a life interest in the residence, barn, and corral, although his right of survivorship in the farm was lost.

The dissenting opinion makes much of the heavy burden of proof and our standard of review while acknowledging that, in some cases, reversals are appropriate. This is such a case, as was *Thiel v. Mobley, supra*. While, admittedly, in *Thiel* the shifting burden of proof was not addressed by this court, we reversed the trial court's twin findings that the testatrix's will in favor of her children and not her husband was executed without the requisite capacity and was the result of undue influence. In doing so, we emphasized that despite conflicting proof of her capacity, there was no evidence that she did not sign the will during a lucid moment or that she was the victim of a malign influence. Those are precisely the issues confronting us in the case at hand.

 We have stated that a finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Nichols v. Wray*, 325 Ark. 326, 925 S.W.2d 785 (1996); *RAD-Razorback Ltd. Partnership v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986). Such is the situation in the case at hand. We conclude that the trial court clearly erred in its finding that Wesley Noland did not act freely and with sound mind when he signed the deed and trust. We reverse the order of the trial court and remand for orders consistent with this opinion.

Reversed and remanded.

NEWBERN, CORBIN, and IMBER, JJ., dissent.

ANNABELLE CLINTON IMBER, Justice, dissenting. While the majority does not decide whether the trial court correctly shifted

the burden to the trust's proponent, it nonetheless concludes that if the burden of proof did shift, the trial court was clearly erroneous in finding that the proponent failed to meet his burden to prove Wesley Noland's mental capacity beyond a reasonable doubt. I cannot join this conclusion.

Assuming for purposes of capacity analysis, as does the majority, that Jerry Noland procured and benefitted from the 1991 trust instrument, the burden shifted to him to prove beyond a reasonable doubt that Wesley Noland possessed the requisite testamentary capacity. This shifting burden marks a significant departure from what is required from a proponent in a "typical" will-contest case:

> Obviously, a proponent of a will, who is a beneficiary and who drafted or caused to be drafted a will, does not enjoy the usual legal advantages given to a document otherwise drawn.
>
> * * *
>
> [B]ecause proof of mental capacity and the lack of undue influence must be proved beyond a reasonable doubt, those advantages, which make it relatively easy to admit a will to probate, obviously do not exist.

*Greenwood v. Wilson*, 267 Ark. 68, 588 S.W.2d 701 (1979). While capacity at the time of the will's execution is the extent of our inquiry, the testator's condition either before or after the time of making the will is relevant as indicating the testator's condition at the time of signing the instrument. *Daley v. Boroughs*, 310 Ark. 274, 835 S.W.2d 858 (1992). One commentator has explained that "[i]n order to place the condition of testator's mind clearly before a jury or a court it is necessary to receive evidence of his condition before and after the time of the execution of the will. . .[t]his can, as a matter of fact, often be determined only from a consideration of his conduct, behavior, methods of thinking, and the like, extending over a period of time." 3 *Page on the Law of Wills* § 29.58 (1961 & Supp. 1997).

Here, the majority acknowledges that the trial court heard "a considerable amount of conflicting testimony" on the subject of Wesley Noland's mental capacity. However, the majority primarily emphasizes that, in its view, the videotaped execution of the

trust and deed demonstrates that Wesley Noland possessed the requisite capacity on September 27, 1991. In support of its position that this videotape shows a man "who essentially knew what he was doing," and that there was "was a complete absence of proof that Wesley Noland was not lucid" at the time of execution, the majority provides citations to cases where the burden had not shifted to the proponents to prove capacity beyond a reasonable doubt. *See Daley v. Boroughs*, 310 Ark. 274, 835 S.W.2d 858 (1992) (affirming trial court's determination that the *contestant* failed to meet his burden of proving lack of capacity by a preponderance of the evidence); *Hiler v. Cude*, 248 Ark. 1065, 455 S.W.2d 891 (affirming trial court's finding that the *contestant* failed to prove lack of capacity; trial court did not err in declining to shift burden to proponents); *Thiel v. Mobley*, 223 Ark. 167, 265 S.W.2d 507 (1954) (reversing trial court's finding that the *contestant* had established lack of capacity). By contrast, in cases where the burden shifted (or should have shifted) to the proponent to prove capacity and lack of undue influence beyond a reasonable doubt, I can find no reported case where this court has ever reversed the trial court's finding that the proponent failed to meet her burden. *See Looney v. Estate of Wade*, 310 Ark. 708, 839 S.W.2d 531 (1992) (affirming trial court's finding that proponent failed to establish capacity and lack of capacity and undue influence beyond a reasonable doubt); *Park v. George*, 282 Ark. 155, 667 S.W.2d 644 (1984) (trial court erred in failing to shift burden to proponents; will under consideration declared void); *Smith v. Welch*, 268 Ark. 510, 597 S.W.2d 593 (1980) (proponents failed to meet burden of proving capacity and lack of undue influence beyond a reasonable doubt); *Greenwood v. Wilson*, 267 Ark. 68, 588 S.W.2d 701 (1979) (proponents failed to meet burden of proving capacity beyond a reasonable doubt); *Orr v. Love*, 225 Ark. 505, 283 S.W.2d 667 (1955) (reversing trial court's determination that proponents had rebutted presumption of undue influence beyond a reasonable doubt); *Warner v. Warner*, 14 Ark. App. 257, 687 S.W.2d 856 (1985) (affirming trial court's finding that proponent failed to prove lack of undue influence beyond a reasonable doubt); *Oliver v. Griffe*, 8 Ark. App. 152, 649 S.W.2d 192 (1983) (affirming trial court's finding that proponent failed to prove capacity and lack of undue influence beyond a reasonable doubt);

*Neal v. Jackson*, 2 Ark. App. 14, 616 S.W.2d 746 (1981) (proponents failed to meet burden of proving capacity and lack of undue influence beyond a reasonable doubt).

While not intimating that this court could never reverse a trial court's determination in this regard, I think that the trial court had considerable evidence before it concerning Wesley Noland's deteriorating mental state, both before and after the execution of the trust, from which to glean a reasonable doubt as to his capacity at the time of execution. At the very least, I am not prepared to say that this determination was clearly erroneous. In my opinion the majority has substituted its view of the evidence for that of the trial court's, without due consideration to the proponent's heavy burden of proof, the trial court's superior position to weigh evidence and evaluate credibility, and our applicable standard of review. For these reasons, I respectfully dissent.

NEWBERN and CORBIN, JJ., join this dissent.