2010 Ark. App. 211

**S. Killeen DesLAURIERS, Appellant**

v.

**The MARILYN IRENE DesLAURIERS REVOCABLE TRUST and Richard Gautney, et al., Appellees.**

**No. CA 09–477.**

Court of Appeals of Arkansas.

March 3, 2010.

Lloyd W. "Tre" Kitchens, Welch and Kitchens, North Little Rock, for appellant.

Ginger Stuart Schafer, Stuart Law Firm, P.A., Lonoke, J. Michael Stuart, Joseph V. Svoboda, Carlisle, for appellees.

JOHN B. ROBBINS, Judge.

This is an appeal regarding the competency of a decedent to execute documents affecting her estate. Appellant S. Killeen DesLauriers (Killeen) appeals the order of the Lonoke County Circuit Court that rejected her attempt to invalidate four documents executed by her cousin Marilyn DesLauriers during and after her stay in the hospital in 2005 following a stroke. As a result of those documents being executed, appellee Richard Gautney (Richard) received the bulk of Marilyn's estate after specific monetary gifts to St. Rose Catholic Church, Lonoke Cemetery Association, Marilyn's beloved cats, and appellant Killeen. Marilyn's wishes were kept confidential by Marilyn and her attorney until after Marilyn's death on July 20, 2007.

Killeen filed suit, a "Complaint To Contest Trust," after Marilyn's death to contest the validity of these documents, contending that Marilyn was not competent to execute them and also that they were procured by the undue influence of Richard. Killeen also asked for other relief, not relevant to this appeal. After hearing testimony and receiving documentary evidence, the trial judge found that Killeen failed to prove undue influence or mental incapacity. This appeal followed in which Killeen challenges only the finding that she did not carry her burden to prove Marilyn's mental incapacity. We have reviewed the evidence and arguments under the appropriate standard, and we affirm the trial court's findings as not clearly erroneous.

We review proceedings such as these de novo, but we will not reverse the trial court's decision unless it is clearly erroneous. *Moore v. Sipes,* 85 Ark. App. 15, 146 S.W.3d 903 (2004). A decision is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made. *Walker v. Torres,* 83 Ark. App. 135, 118 S.W.3d 148 (2003). When reviewing the proceedings, we give due regard to the opportunity and superior position of the trial judge to determine the credibility of the witnesses. *Moore, supra.* The party contesting the validity of the will has the burden of proving by a preponderance of the evidence that the testatrix lacked mental capacity at the time the will was executed or that the testatrix acted under undue influence. *Looney v. Estate of Wade,* 310 Ark. 708, 839 S.W.2d 531 (1992).

The evidence regarding Marilyn's life and personal activities is not in material dispute. Marilyn was raised a Catholic, attended St. Rose Catholic Church, graduated from a Catholic school, and was employed as a nurse at St. Vincent Infirmary during her working years. Marilyn, a divorced woman with no children, lived in rural Lonoke, Arkansas, and was occasionally kept company by appellee Richard and his wife Karen. Richard kept her yard mowed and also tended to chores for Marilyn, such as arranging for contractor's work, bringing her food, and the like. Their friendship dated back to 1988. Marilyn had a tremendous fondness for her many cats, was a bit eccentric, was fiercely independent, and made no secret that she feared having to enter a nursing home. She was not close to her relatives and did not see them often.

Marilyn suffered a stroke at home on July 15, 2005. Richard found her inside her home and summoned an ambulance. She was hospitalized in a Jacksonville hospital through August 18, 2005, and then she was moved to Baptist Rehabilitation to further recuperate. Marilyn's medical records noted vascular dementia and delirium.

She suffered confusion and disorientation at times. She eventually went home and was able to live there with the help of an in-home aide, who said Marilyn had good days and bad days as far as her mind was concerned. She died two years later, on July 20, 2007, at the age of eighty-two.

When the attorney revealed the material contents of her trust and will after her death, Killeen learned of her specific $50,000 gift and that she was a member of a class (heirs at law) designated to receive 25 percent of the residue of Marilyn's estate. Killeen was displeased that Marilyn would give the remaining 75 percent of the residue of her estate to her "yardman," and she sought to have the documents all declared null and void due to Marilyn's incompetency.

Killeen submitted the deposition testimony of four physicians who had treated Marilyn around the time of the execution of the documents, and they all opined that Marilyn was suffering from dementia and would be incompetent to execute those documents. The first was Dr. Layton, a geriatric specialist who treated Marilyn in Jacksonville during her stay between July 15 and August 18, 2005, who opined that she was incapacitated due to irreversible dementia. However, Dr. Layton was not present at the signing of any of the documents, which were all executed after August 18. The second was Dr. Flores, who only reviewed Marilyn's medical records and did not recall treating her, who opined that she was not competent to execute legal documents. The next was Dr. Yokum, who treated Marilyn as her orthopedic surgeon. Dr. Yokum saw Marilyn three times on rounds in September at Baptist Rehabilitation, and he described her as suffering from dementia and disorientation and believed her unable to consent to her own medical procedures. Dr. Yokum was not present at the signing of

any of the documents. Last was Dr. Rector, who was Marilyn's pulmonologist at Baptist Rehabilitation in August 2005. Dr. Rector, who was also not present at the execution of any of the documents, opined that Marilyn suffered dementia and confusion such that she would be unable to execute any documents at issue.

The medical records entered into evidence described Marilyn as suffering from confusion and disorientation, but they also reflected notes of alertness and doing well. Her impairment was sometimes described as severe, whereas other times it was described as mild.

Killeen also called two lay witnesses to the stand. One was another cousin, Joy Ann Richardson. Richardson visited Marilyn at Baptist Rehabilitation in August 2005, and she said that Marilyn did not recognize her and she was speaking about her deceased parents as if they were alive. Richardson stood to inherit some of Marilyn's estate, and she believed the trust to be invalid because she thought Marilyn "was all about family." Next was Gary Spears, a Lonoke farmer who worked Marilyn's acreage from the mid 1990s until 2006. Spears testified that he thought Richard was in control of the majority of Marilyn's business, that it would be unlike Marilyn to sign anything, much less a will, and that during his hospital visits, Marilyn seemed very confused.

In contrast, Richard presented the testimony of the lawyer whom Killeen hired to help Marilyn, Mike Munnerlyn, who stated that he was very careful to determine whether his client was legally competent to execute the documents. Munnerlyn was hired because he specialized in estate-planning matters and because he grew up in Lonoke, which gave him more credibility with Marilyn.

Munnerlyn expressed shock that Killeen would try to set the documents aside.

Munnerlyn testified that he was hired by Killeen to prepare a power of attorney, which placed Killeen and Richard in charge of Marilyn's business affairs, and that Killeen insisted from the very beginning that while Marilyn was odd, she was very competent. The durable power of attorney was acknowledged on August 17, 2005, by Munnerlyn.

Killeen never questioned the validity of the power of attorney and wrote checks and conducted business for her cousin for the next two years. Munnerlyn explained that Killeen paid all invoices for his work, that he billed Richard and Killeen for those services with mailed statements explaining his charges, and that they discussed his role in helping Marilyn with her "estate planning."

While Marilyn was in Baptist Rehabilitation, she executed the quitclaim deed and revocable trust, both dated August 24, 2005, before Munnerlyn. The deed conveyed her real-property interest into the trust. The trust made the specific aforementioned gifts. On September 8, 2005, Marilyn executed her last will and testament at Baptist Rehabilitation. Munnerlyn asked two hospital employees to attend as attesting witnesses. Both women testified that they met Marilyn in her hospital room, they chatted for ten to fifteen minutes, and they both observed Marilyn to appear fully aware of what she was doing. Neither woman stood to gain anything from Marilyn or her estate.

Munnerlyn explained that Marilyn was very fearful that someone would attempt to contest her trust and will documents. Therefore, he said he explained the option of creating a "no contest" clause so that any beneficiary contesting the trust and will risked forfeiting any bequest. Munnerlyn wrote such a clause into the documents. Munnerlyn said that Marilyn was cognizant of her church, the cemetery where her parents were buried and where she would be buried, her concern for her cats and humane organizations, and her strong desire to divide her remaining assets without the need for probate. Munnerlyn said he took notes during their private meetings, and the information came from Marilyn herself.

Munnerlyn testified that he met with Marilyn several times to discuss her property, her desires, and her ideas about estate planning. In furtherance of Marilyn's wishes, Munnerlyn prepared a first amendment to the revocable trust that affected her farm acreage and mineral rights. That document was executed at Marilyn's home on December 13, 2005, before Munnerlyn.

At the hearing, Killeen testified that she hired Munnerlyn to draft only a power of attorney because this was suggested to her by hospital personnel. Killeen, a practicing obstetrician/gynecologist, denied anyone making mention of a guardianship. Killeen and Richard were given equal authority under that power of attorney to write checks for Marilyn and to act on her behalf. Killeen explained that although she believed Marilyn was too ill to understand what was going on, Killeen only wanted to do what was necessary to quickly be able to make decisions on her cousin's behalf.

Killeen denied ever receiving the mailed billing documents that explained what Munnerlyn was preparing. Killeen acknowledged that she signed checks to pay for his services, and that the memorandum line on one check read "estate planning," but she professed ignorance of the other documents' existence or purpose. Killeen was convinced that Richard had an inappropriate relationship with her cousin and took advantage of her age and pliability.

Dr. Les Anderson, a family physician practicing in Lonoke, testified that he had known Marilyn all his life and that he had treated her on March 23, 2006, after her stroke and return home. After speaking to Marilyn at the clinic, Anderson thought it remarkable how well she had fared mentally, though not physically, from the stroke.

Richard and his wife Karen testified that they were surprised at what Marilyn had done for them at her death, and they testified to their actions as neighbors and friends through the many years since 1988. Richard was not present for the signing of any of the subject documents.

On this evidence, after considering the credibility of the witnesses, the judge found that Killeen failed in her burden to prove by a preponderance of the evidence that Marilyn lacked the mental capacity to execute the documents at issue. The judge found that Marilyn had, at the time of the execution of documents, the power to think rationally and to retain without prompting the nature of her estate, the disposition she desired, and the beneficiaries of her desires. An order recited these findings, and this appeal followed.

Testamentary capacity means that the testator must be able to retain in her mind, without prompting, the extent and condition of her property, to comprehend to whom she is giving it, and relations of those entitled to her bounty. *Daley v. Boroughs,* 310 Ark. 274, 835 S.W.2d 858 (1992). In *Noland v. Noland,* 330 Ark. 660, 956 S.W.2d 173 (1997), our supreme court wrote:

> Complete sanity in the medical sense is not required if the power to think rationally existed at the time the will was made. Furthermore, our own law is clear that despite any mental impairment, the testator may execute a will if he is experiencing a lucid interval. The time to look at a testator's mental capacity is at the time the will is executed. However, proof may be taken as to the testator's condition both before and after the will's execution as being relevant to his condition at the time the will was executed. This court has upheld mental competency at the time of the execution of a will even in the wake of evidence of some mental deterioration.

*Id.* at 665—66, 956 S.W.2d at 176 (citations omitted). A testator's old age, physical incapacity, and partial eclipse of mind will not invalidate a will if he has the requisite testamentary capacity when the will is executed, also known as a "lucid interval." *Pyle v. Sayers,* 72 Ark. App. 207, 34 S.W.3d 786 (2000); *Hodges v. Cannon,* 68 Ark. App. 170, 5 S.W.3d 89 (1999).

In this case, there was conflicting testimony on Marilyn's mental capacity. It was the trial court's duty to weigh the testimony and resolve the conflicts. The persons in the room with Marilyn at the execution of each document all testified that she appeared coherent and fully aware of her actions. Upon our de novo review, we hold that the trial court did not clearly err in finding that she was mentally competent at the time she executed the documents.

Affirmed.

GLOVER and MARSHALL, JJ., agree.