Terry HOOTEN, Special Administrator of the Estate of Sammy J. Hooten, Deceased *v.* Jacqueline JENSEN

CA 05-742 227 S.W.3d 431

Court of Appeals of Arkansas
Opinion delivered February 8, 2006

*Jeff Mobley*, for appellant.

*Laws & Murdoch, P.A.*, by: *Timothy W. Murdoch*, for appellee.

R OBERT J. GLADWIN, Judge. Terry Hooten, special admin-istrator for the estate of his deceased father, Sammy J. Hooten, appeals from an order of the Pope County Circuit Court denying his request that Sammy's marriage to appellee Jacqueline Jensen (Jackie) and certain transactions made by Sammy be set aside on the grounds that he lacked mental competency and acted under the undue influence of Jackie. The controlling question on appeal is the sufficiency of the evidence. We affirm the circuit judge's decision.

Sammy worked as a foreman for H.C. Price Company, which provided a pension plan for its employees. In 1999, Sammy designated Terry as his beneficiary, and another son, Cordy Hooten, as contingent beneficiary, for death benefits under the plan. After Sammy met Jackie at work, they became romantically involved, and she moved in with him at his house in Atkins in 2000. He added her name to his account with First Arkansas Valley Bank in Russellville on September 15, 2000.[1]

On May 7, 2001, at the age of fifty-two, Sammy showed symptoms of having suffered a stroke. He saw his family physician, Dr. William Scott, that day. Dr. Scott performed tests that indi-cated that Sammy had suffered two strokes. Dr. Scott referred him to Dr. J. Brett Ironside, a neurologist, who saw Sammy on May 10, 2001. On May 11, 2001, Sammy and Jackie were married by a Yell County justice of the peace, Thomas Randall. Sammy signed a

---

[1] Terry concedes that Sammy still had mental capacity when he added Jackie's name to this account.

form naming Jackie as his pension-plan beneficiary on May 16, 2001. The same day, he placed Jackie's name as a joint owner with right of survivorship on his account with Simmons First Bank of Russellville. Sammy traded his 2000 Dodge Ram truck and paid $5450 for a 2000 Jeep Grand Cherokee at Hagans Dodge-Chrysler-Plymouth Motors, Inc., on May 18, 2001. On June 11, 2001, he sold a 1997 Dodge truck to Floyd Harris, who gave him a check for $11,750, which was deposited in the account with First Arkansas Valley.

On June 12, 2001, Sammy was admitted to the hospital. He died on June 15. His death certificate listed his cause of death as myocardial infarction, as a consequence of stroke. Because of the rapid onset of symptoms before Sammy's death at a relatively young age, Dr. Scott recommended that Sammy's body be exhumed for an autopsy. Dr. Frank Peretti, a forensic pathologist, performed the autopsy on March 15, 2002. He concluded that hypertensive arteriosclerotic cardiovascular disease caused Sammy's death; that Sammy also had metastatic lung cancer and an enlarged heart; and that Sammy had suffered multiple heart attacks, of which he had probably not been aware. Only acetaminophen was detected by the toxicology analysis.

After being appointed as special administrator, Terry sued Jackie and H.C. Price Company on July 11, 2001, in the equity division of the Pope County Circuit Court, asking for an injunction prohibiting Jackie from receiving the pension benefits and seeking to set aside Jackie's designation as beneficiary. Terry alleged that, when Sammy signed the new designation-of-beneficiary form, he was mentally and physically incapable of making a rational decision and that Jackie took advantage of his impairment to convince him to marry her and to change his beneficiary. On August 27, 2001, Terry filed a separate lawsuit in the same court against Hagans Motors, Jackie, Mr. Harris, and Truman and Betty Tucker (who purchased the Dodge Ram truck from Hagans Motors), seeking to have the vehicle transactions set aside and the money and Sammy's other property exchanged therein returned to his estate. He also asked for an injunction directing Jackie to return the $19,500 that she had withdrawn from the two bank accounts. Terry's complaints for equitable relief were consolidated with the probate case.

At trial, Terry attempted to prove that Sammy was not mentally competent to enter into these transactions or to marry Jackie and that Jackie exerted undue influence over Sammy.

Jackie, Dr. Peretti, Mr. Randall, Cordy, Terry, Marvin Baswell, Juanita Lee, Margaret Ingram, David Ward, Jeff Hagans, and Mr. Harris testified. The depositions of Dr. Scott, Dr. Ironside, and Robin Rudell were introduced into evidence.

The trial judge issued a letter opinion on November 30, 2004, in which he found that Terry had not met his burden of proof. He explained:

> The burden of proving mental incapacity rests on the person seeking to set aside the contract or transaction; the burden of proof is by a preponderance of the evidence; [e]very case must be decided on its own peculiar facts and circumstances.

> There is much conflicting testimony in this case. William Scott, M.D., Sammy J. Hooten's family physician, testified that as of May 7, 2001, Sammy Hooten was not mentally competent to manage his own affairs, to contract marriage, or handle business transactions. However, Dr. Scott also testified that he referred Sammy J. Hooten to a neurologist, J. Brett Ironside, M.D., and that he would defer to Dr. Ironside's opinion because Dr. Ironside is a specialist in that area. Dr. Scott further testified that Dr. Ironside would be in a better position than himself, based upon his education, training, and experience, to make a determination of competency.

> J. Brett Ironside, M.D., Board Certified Adult Neurologist, testified that he first saw Sammy J. Hooten, May 10, 2001, as a result of a referral from Dr. Scott. He testified that Sammy J. Hooten at times seemed a bit slow to process some of his instructions, but this was likely due to language dysfunction which is not the same thing as cognitive abilities or intelligence. Dr. Ironside was asked,

> Q. As far as his mental functioning, apart from using the wrong word or the wrong consonant, that you mentioned earlier, did you find any deficiencies?

> A. I did not.

> He then testified that in his opinion, although Sammy J. Hooten's language difficulties might make it at times a little tough for him to communicate what he was thinking or wanting to do, that did not imply loss of capability to do it.

> Under cross-examination, Dr. Ironside was asked,

Q. And this man got married on May 11. I want to ask you this question, Sir: Do you feel that the condition that this man was in when you saw him on the 10th, that he was truly capable of making sound business decisions concerning the sale of property, entering into a marriage, negotiating the sale of vehicles, trading one for another and paying boot and that sort of thing?

A. I have no reason to say that he was incapable of it.

Q. Well, would this condition put him in a position to where he would be susceptible, or more susceptible, than a normal person to undue influence?

A. Not more susceptible to undue influence, I wouldn't say that, no.

Dr. Ironside also testified that he would not have a reason to think Sammy Hooten's condition would change from the time he first saw him on May 10, 2001, without some new event, and that the new event occurred on or shortly prior to June 12, 2001, causing him to go to the emergency room.

In addition to the expert testimony, the majority of the lay testimony heard in this case leads the Court to believe that Sammy J. Hooten was competent to enter into the subject marriage and transactions.

The Court concludes after hearing the vastly conflicting testimony that the Special Administrator has failed to meet the burden of proving by a preponderance of the credible evidence that the marriage and transactions in question should be set aside as a result of the alleged incompetency of Sammy Hooten. Furthermore, the Special Administrator has not proven that the transactions in question should be set aside for fraud or undue influence practiced by Jacquelyn Hooten. Therefore, the Special Administrator's Complaints should be dismissed with prejudice. Jacquelyn Hooten's Petition for Dower should be granted.

In the judgment entered on December 30, 2004, the trial judge denied Terry's request that the marriage and the transactions be set aside; granted Jackie's petition for dower; found that the bank accounts, the pension benefits, and the Jeep were Jackie's

property; and declared Mr. Harris to be the owner of the 1997 Dodge truck. Terry filed a notice of appeal on January 14, 2005, from that decision.

Whether undue influence occurred in connection with a contract is a question for the trier of fact. *Jones v. Balentine*, 44 Ark. App. 62, 866 S.W.2d 829 (1993). We will not reverse a trial judge's findings regarding mental capacity or undue influence unless they are clearly erroneous, *Noland v. Noland*, 330 Ark. 660, 956 S.W.2d 173 (1997), and we defer to the trial judge's superior position to decide credibility issues. *Coleman v. Coleman*, 59 Ark. App. 196, 955 S.W.2d 713 (1997).

Terry makes the following arguments on appeal: (1) Jackie unduly influenced Sammy into entering into the marriage and the disputed transactions; and (2) because Jackie was the dominant spouse, a presumption of undue influence and coercion arose, and the burden of proof should have been placed upon her.

 We begin our discussion by noting that Terry cannot challenge the validity of Sammy's marriage to Jackie. Arkansas Code Annotated section 9-12-201 (Repl. 2002) provides:

> When either of the parties to a marriage is incapable from want of age or understanding of consenting to any marriage, or is incapable of entering into the marriage state due to physical causes, or where the consent of either party shall have been obtained by force or fraud, the marriage shall be void from the time its nullity shall be declared by a court of competent jurisdiction.

In *Vance v. Hinch*, 222 Ark. 494, 261 S.W.2d 412 (1953), our supreme court considered the effect of this statute's predecessor and concluded that, after a wife's death, her heirs could not attack her marriage to the appellee on the basis of her mental incompetence, because a voidable marriage can only be inquired into during both of the parties' lives. In the case at bar, the issue of whether the marriage should be set aside was argued before, and decided by, the trial court. All of the issues raised in the court below are before us for decision, and trial *de novo* on appeal in equity cases involves the determination of fact questions as well as legal issues. *See Jones v. Abraham*, 341 Ark. 66, 15 S.W.3d 310 (2000). We will uphold the trial court's decision unless it is clearly erroneous. Although the trial court announced that there was insufficient evidence of Sammy's alleged incompetency to warrant setting aside the marriage and transactions in question, and further stated that

the transactions in question would not be set aside for fraud or undue influence practiced by Jackie, we can affirm a trial court if it reaches the right result for the wrong reason. *Middleton v. Lockhart*, 355 Ark. 434, 139 S.W.3d 500 (2003). Therefore, in keeping with *Vance*, we affirm with respect to the trial court's decision regarding Sammy's marriage to Jackie, and address the validity of the disputed transactions separately.

According to Terry, Sammy's strokes rendered him mentally weakened and susceptible to undue influence by Jackie, on whom he depended, as illustrated by the following: (1) Mr. Randall testified that Sammy did not speak during the marriage ceremony and gave only a grunt and a nod for his "I do"; that Sammy was assisted into the building by Jackie; and that he was not sure that Sammy knew exactly what was happening; (2) on the day before the wedding, Dr. Ironside's examination of Sammy lasted only fifteen minutes and revealed that Sammy had trouble communicating; (3) Terry testified that, before the wedding, his father told him that he probably should not marry Jackie because she smoked, drank alcohol, and had children; that, after Sammy had a stroke, he mistook Terry for one of his brothers; and that Jackie prevented Terry and Cordy from seeing Sammy during his illness; (4) Jackie did most of the driving so that the transactions in question could be conducted; and (5) although Jackie insisted that Sammy was competent, she could not explain why she signed some of the relevant documents for him.

It is generally recognized that, in order to invalidate a contract on the ground of undue influence, a party must be deprived of his free will. *Dent v. Wright*, 322 Ark. 256, 909 S.W.2d 302 (1995). The questions of undue influence and mental capacity are so closely interwoven that they can be considered together. *See Noland v. Noland, supra.* The influence that the law condemns is not the legitimate influence that springs from natural affection, but the malign influence that results from fear, coercion, or any other cause that deprives the individual of his free agency. *Id.* Undue influence may be inferred from the facts and circumstances of a case. *Looney v. Estate of Wade*, 310 Ark. 708, 839 S.W.2d 531 (1992). In the context of a will, it has been held that, where the mind of the testator is strong and alert, the facts constituting undue influence must be stronger than where the mind of the testator is impaired either by some inherent defect or by the consequences of disease or advancing age. *Pyle v. Sayers*, 344 Ark. 354, 39 S.W.3d 774 (2001).

Dr. Scott testified that, when he saw Sammy on May 7, Sammy had problems with his memory and following instructions and had left-and-right confusion; although his answers were slow, they were appropriate. He said that, when he saw Sammy on May 21, he had deficits in memory, cognitive function, and coordination. Dr. Scott stated that, when he saw Sammy on May 27, Sammy did not respond appropriately to questions and did not seem to understand what he (Dr. Scott) said. He testified that he did not believe that, on May 10, Sammy was able to make decisions for himself. However, he stated that he would defer to Dr. Ironside's opinion.

Dr. Ironside testified that, although Sammy had some difficulty in talking, he was able to provide an accurate history; that he (Dr. Ironside) found no evidence of mental deficiency; and that Sammy was competent to manage his own affairs and to make sound business decisions. He also stated that Sammy was not more susceptible than a normal person would be to undue influence, and that, although the area of Sammy's brain related to language function was damaged, he had no cognitive impairment.

Mr. Randall testified that he would not have performed the marriage ceremony if he had doubted Sammy's mental competency.

Jackie said that Sammy's visit with Dr. Ironside lasted for one to one-and-a-half hours. She testified that purchasing the Jeep was Sammy's idea, so that they would have a vehicle that was easier for her to drive. She stated that Sammy conducted the negotiations for the Jeep and that she did not discuss the transaction with the salesman, the manager, or the person who prepared the documents. Jeff Hagans testified that he negotiated with Sammy about the purchase of the Jeep while Jackie "basically sat there." He said that Sammy was very alert and that there was nothing out of the ordinary about the transaction. Although Jackie admitted signing the documents for the deal with Hagans Motors and the sale to Mr. Harris, she said that she did so at Sammy's request. David Ward, who witnessed the sale to Mr. Harris at First Arkansas Bank, testified that Sammy asked if his wife could sign the title; that he was able to understand Sammy; that there was no question about what Sammy wanted; and that Sammy and Mr. Harris "did the deal." Mr. Harris stated that Jackie was not present when he and Sammy negotiated the deal and that, although he could tell that Sammy had suffered a stroke, Sammy knew what he was doing.

Juanita Lee, who works at Simmons, testified that she saw Sammy sign the pension beneficiary-designation form and the bank account signature card. She said that Sammy's responses were appropriate; that he and she understood each other; that she was able to communicate with him; and that Jackie played very little part in the conversation.

Marvin Baswell, who knew Sammy for about three years and purchased a dozer from Sammy in April 2001, testified that, when Sammy telephoned him about a week or two before he died to ask how the dozer was running, he made sense and said nothing inappropriate. Robin Rudell, who worked on Sammy's dozers, testified that, after the stroke, Sammy talked a little loudly and slurred his words but was able to understand conversation, to work on the dozer, and to communicate how he wanted the work done on the dozer. About a week before Sammy "got really down," Robin said, Sammy seemed drunk and could not understand conversations, although he could run the dozer. He stated that he could understand Sammy as late as June 10. Margaret Ingram, who testified that she had known Sammy since 1981, said that, when Sammy brought Jackie to her house in mid-May and introduced her as his wife, he was "fine" and had no trouble speaking or understanding her.

In light of this evidence, the trial judge's findings are not clearly erroneous, and we affirm on this point.

Terry argues in his second point on appeal that the trial judge erred in placing the burden of proof on him. However, this argument was not raised to, or ruled on, by the trial judge. We will not address an argument where it is not shown that it was made in the trial court and ruled upon there. *See Turner v. Farnam*, 82 Ark. App. 489, 120 S.W.3d 616 (2003).

Affirmed.

CRABTREE, J., agrees.

ROBBINS, J., concurs.

JOHN B. ROBBINS, Judge, concurring. I concur in the majority's decision to affirm this case. I write separately because I would reach the merits of Terry's argument that Jackie unduly influenced Sammy into entering into the marriage. In light of the evidence, the trial court did not clearly err in finding no undue

influence and in failing to set aside the marriage. I agree with the majority's conclusion that none of the remaining findings were clearly erroneous.

Citing *Vance v. Hinch*, *supra*, the majority held that Terry cannot challenge the validity of the marriage because one of the parties to the marriage is deceased. However, that issue was not raised as a defense below, and we will not consider arguments that were not argued to the trial court. *See Laird v. Shelnut*, 348 Ark. 632, 74 S.W.3d 206 (2002). Moreover, Jackie does not even make this argument on appeal. It is axiomatic that we refrain from addressing issues not raised on appeal. *Phillips v. Earngey*, 321 Ark. 476, 902 S.W.2d 782 (1995). I submit that our review should be limited to the issues that have been raised and developed by the parties. And even if this issue were before this court, it would be unnecessary to affirm on the basis that the trial court reached the right result for the wrong reason because the reason given by the trial court was not wrong.