Cite as 2022 Ark. App. 311

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-20-9

| | |
|---|---|
| JACK BENNETT AND CINDY BENNETT | Opinion Delivered September 7, 2022 |
| APPELLANTS | APPEAL FROM THE DREW COUNTY CIRCUIT COURT [NO. 22CV-18-87] |
| V. | |
| WILEY B. BALLOW | HONORABLE QUINCEY ROSS, JUDGE |
| APPELLEE | AFFIRMED |

**ROBERT J. GLADWIN, Judge**

On September 13, 2019, the Drew County Circuit Court entered a decree setting aside two special warranty deeds in which the appellee, Wiley Ballow, transferred forty-nine acres of land in Drew County to the appellants, Cindy and Jack Bennett. The court determined that Mr. Ballow lacked the requisite mental capacity to execute the deeds or, alternatively, that the transfer of the property was the product of undue influence and constructive fraud. The Bennetts now appeal the circuit court's decree. We affirm.

I. *Factual Background*

On December 14, 2017, when he was ninety-one years old, Mr. Ballow was involved in a single-car accident in which he suffered multiple fractured ribs and a laceration to his forehead. He was hospitalized at Jefferson Regional Medical Center (JRMC) from December

14, 2017, through January 15, 2018. Mr. Ballow was discharged to a nursing home for additional care from January 15, 2018, through February 2, 2018.

At the time of his accident, Mr. Ballow was living in a trailer on a forty-nine-acre tract of land in Drew County. He purchased the land while he was serving overseas as a Marine in World War II, and he lived on the property for approximately twenty-five years following his retirement from the aircraft-manufacturing industry. Mr. Ballow owned the land until he was hospitalized in December 2017. At that time, he executed two special warranty deeds transferring the property to his neighbor, Jack Bennett.

Mr. Bennett's lawyer drafted both of the warranty deeds. Mr. Ballow executed the first on December 26, 2017. In that document, Mr. Ballow purported to transfer all forty-nine acres of his property to Mr. Bennett "for and in consideration of the sum of one dollar and the assistance provided to [him] by Jack Bennett over the years." The first deed was never recorded, however, because it contained an error in the legal description of the property. Consequently, Mr. Ballow executed a second special warranty deed on December 31, 2017. As in the first deed, the transfer was in exchange for "the sum of one dollar and the assistance provided to [Mr. Ballow] over the years." The second deed was recorded in Drew County on January 5, 2018.

At trial, Sherry Knight, a middle-school teacher in Monticello, testified that she met Mr. Ballow the following spring when he answered a newspaper advertisement seeking military veterans who would agree to be interviewed for a school project. The two became friends after Mr. Ballow's interview, and Ms. Knight began to visit him on a regular basis.

The poor condition of Mr. Ballow's trailer, which Ms. Knight observed on those visits, led to another school project "to get Mr. Ballow a house to live in." It was in connection to that second project that Ms. Knight found the recorded warranty deed that transferred Mr. Ballow's property to Mr. Bennett.

Ms. Knight and LeAnn Burch, a lawyer and veteran who also participated in the veterans project, went to Mr. Ballow's property to show him the deed transferring his land to Mr. Bennett. According to Ms. Knight, Mr. Ballow "couldn't understand why Jack Bennett owned his land" and "said he remembered that [Mr. Bennett] came to his [hospital] room, but Mr. Ballow thought that he was signing so that [Mr. Bennett] could take care of his property while Mr. Ballow was in the hospital." Ms. Burch testified that Mr. Ballow initially did not remember "signing anything about his property." She further testified that he "did not understand the [deed] when he read it," but its significance "dawned on him" once she and Ms. Knight explained that "he might not own the land if that was his signature" on the deed. Mr. Ballow confirmed that his signature was on the deed, but he could not "relate [the deed] to a particular event." Mr. Ballow eventually recalled "signing something in the hospital." He "was adamant," however, "[that] he [would not] give away his property." He told Ms. Burch, in fact, that "if he was going to bequeath the property, he [would] leave it to some family member in Texas when he died."

Thereafter, with Ms. Knight's assistance, Mr. Ballow hired a lawyer and filed a petition to set aside the warranty deed on April 12, 2018. The petition alleged that the deed was the

3

product of constructive fraud, undue influence, and unilateral mistake.[1] In an affidavit attached to the petition, Mr. Ballow asserted that "[o]n or about December 31, 2017," he "executed a special warranty deed at the request of . . . Jack Bennett," while suffering from "a laceration to the head, multiple fractures of the ribs, and generalized muscle weakness." Mr. Ballow further asserted that he understood the purpose of the deed "was to temporarily allow Defendant, Jack Bennett, to look after my property while I was hospitalized."

In their answer, the Bennetts "admit that [Mr. Ballow] signed a deed on his homeplace in Drew County to Defendant Jack Bennett while in the hospital in Pine Bluff." They affirmatively alleged, however, that "it was Mr. Ballow who requested [Jack] to have a deed prepared so Plaintiff could give his homeplace to [Jack] in consideration of the assistance provided to [Mr. Ballow] by [Jack] over many years," including "doing work on his homeplace to make same habitable, providing him with water to drink and bathe, washing his clothes, paying his personal bills from time to time with [Jack's funds][and] buying him and taking him groceries." The Bennetts also affirmatively alleged that "others have unjustifiably interfered with their long-standing good and supportive relationship," and in fact, the Bennetts "do not desire to keep ownership of [Mr. Ballow's homeplace if he himself truly wants [it] back." The Bennetts, therefore, offered to "deed [the land] back to [Mr.

---

[1]The petition also sought a declaratory judgment denying the validity of "any last will and testament" that Mr. Ballow executed while he was hospitalized. The circuit court dismissed the declaratory-judgment request for lack of any proof that Mr. Ballow executed a will during that time. Mr. Ballow has not cross-appealed that ruling; therefore, there will be no further discussion of it here.

4

Ballow] upon receipt of the voluntary written and signed demand of [Mr. Ballow] that [the Bennetts] deed the subject property back to him." The writing must "recite that in making same Mr. Ballow is not being influenced by Sherry Knight or others associated with her," and "upon receipt of the opinion of a qualified independent professional that [Mr. Ballow's] actions in demanding a deed-back is not the result of manipulation or undue influence of others."

The "deed-back" apparently did not occur, and the case went to trial on September 3, 2019. At trial, Mr. Ballow testified that he had known Jack "all his life, since he was a little boy," and he met Cindy Bennett when she married Jack. He said that they were neighbors who lived "almost directly across the street." As for how much the Bennetts assisted him over the years, Mr. Ballow testified that Cindy made meals for him "two or three times a week" until he asked her to stop in favor of his own cooking. Jack "mowed [his] yard a couple of times" and helped him pick out a new trailer to live in. Cindy also drove him to the post office "one time."

Mr. Ballow further testified that he was "sure" that he "never promised Jack that I was going to give him any of my forty-nine acres because Jack and Cindy have helped me with things." According to Mr. Ballow, Jack and Cindy both visited him while he was in the hospital following his automobile accident. He claimed that Jack "showed up with a lady" who was a notary public and "had papers with him." Mr. Ballow testified that Jack told him that he "needed [Mr. Ballow's] signature on [the] papers," suggesting that he needed to look after Mr. Ballow's property while he was in the hospital. Mr. Ballow further testified that he

5

"never told [Jack] to have a lawyer prepare a deed so I could give my land to him." Mr. Ballow also claimed that he "was not sure whether he signed the papers that [Jack] wanted him to sign," and he did not know that he transferred his property to Jack until Ms. Knight showed him the special warranty deed that had been recorded on January 5, 2018.

Mr. Ballow also testified that the land "is worth quite a bit of money" because it has "timber on it that has not been cut in 65 years." He asserted that "[t]he ability to sell timber off the property is important to [him]," but he was told he could not do so because he "did not own the land anymore." At the conclusion of his testimony on direct, Mr. Ballow declared that it was "important to [him] that [he] makes the decision about what happens to [his] land after he dies" because he wants "the land to go to somebody [he] wants it to go to." That somebody, according to Mr. Ballow, "is not Jack Bennett."

Cindy testified that she visited Mr. Ballow "within a day or two" of learning about his accident. She claimed that she and her husband visited Mr. Ballow separately and "at the same time." Cindy further testified that on one of her separate visits, Mr. Ballow "told [her] to tell [Jack] to come and see him." According to Cindy, Mr. Ballow "said that he was old and that he did not need the land forever" and later told her—after signing the deed—that "he was sorry that Mr. Bennett did not put [Cindy's] name on the deed." Mr. Ballow did not recall those conversations, however, after his release from the hospital, and he was surprised when Cindy told him that he had transferred the land to Jack.

Regarding the nature of their relationship with Mr. Ballow, Ms. Bennett testified it was "a friendly and close one" for many years. Ms. Bennett brought him meals and visited

6

him regularly. The Bennetts also were Mr. Ballow's emergency contacts while he was hospitalized. Ms. Bennett helped Mr. Ballow select the nursing home after his discharge from JRMC, ultimately choosing one that was "close to [the Bennetts]." According to Ms. Bennett, she brought Mr. Ballow clothes and visited him "every day or every other day" while he was in the nursing home. After Mr. Ballow was discharged from the nursing home, Ms. Bennett drove him to the bank and the grocery store as needed because "he was [no longer] able."

For his part, Jack Bennett testified that the deed "was prepared because [his] wife and daughter came home from visiting Mr. Ballow, and they told [him] that Mr. Ballow wanted to see [him] about [Mr. Ballow's] land." Mr. Bennett testified that when he arrived at the hospital, Mr. Ballow said that "he was 91 years old, that he was not going to need the land much longer, and that [he] wanted me to have the land." Mr. Bennett had his lawyer prepare a deed, whereupon he returned to the hospital to see Mr. Ballow on December 26, 2017. Mr. Bennett testified that he read the deed to Mr. Ballow, and Mr. Ballow signed it.

Mr. Bennett also explained that the second deed (the one executed on December 31, 2017), was necessary because his attorney told him that "there was something wrong with the legal description, and the deed would need to be redone." Mr. Bennett returned to Mr. Ballow with the corrected deed and told him that "there had been a correction to the deed and that [Mr. Ballow] needed to resign. Mr. Bennett claimed that he did not know, however, if Mr. Ballow read the revised deed, or whether Mr. Bennett read it to him, as before. Mr.

7

Bennett also said that Mr. Ballow was "happy and interacting and carrying on a conversation" and "did not appear confused at all" when he signed the deeds.

Regarding their friendship, Mr. Bennett testified that he has known Mr. Ballow since he (Mr. Bennett) was "five years old." He also claimed that there was "not a whole lot that he had not done for Mr. Ballow over the years," including repairing Mr. Ballow's car and four-wheeler, mowing his yard, helping him to find a new trailer to live in, and driving him to the store and to the doctor. He also paid Mr. Ballow's bills while he was in the hospital. Mr. Bennett further testified that Cindy has washed Mr. Ballow's clothes, taken him to the bank and the grocery store, and provided him with food and clothing. Mr. Bennett asserted that he did not help Mr. Ballow "just to get something back," but rather, because he has "been doing it for all his life." He also testified that he has not had any interaction with Mr. Ballow since the filing of the lawsuit, but "[his] wife continues to check on him."

On cross-examination, Mr. Bennett elaborated on the circumstances surrounding the execution of the two warranty deeds. He explained that Jenny Lemoine, a lawyer and notary public, accompanied him on both occasions, and "they went to two different rooms" on December 26 and December 31. Mr. Bennett assumed that was because Mr. Ballow had been transferred "out of the regular hospital floor on December 28 to the rehab wing." Mr. Bennett said he asked his lawyer to prepare the deed rather than wait to take Mr. Ballow to a lawyer of his own choosing "because Mr. Ballow is 91 years old," and "he did not need it anymore," and "he wanted to get it taken care of."

Jenny Lemoine testified that Mr. Bennett is her maternal uncle, and she accompanied him to the hospital to see Mr. Ballow on both December 26 and 31. According to Ms. Lemoine, Mr. Bennett called her and "asked me to come to JRMC" because "they needed a notary and could not find one due to the holidays." She testified that Mr. Bennett asked her to come because the transfer of the property "was weighing on Mr. Ballow's mind." Ms. Lemoine claimed that at that time, she "did not know what she was going to notarize."

Otherwise, Ms. Lemoine had difficulty separating the circumstances of the two visits because "they were close in time." She testified that on one occasion, "Mr. Ballow read the deed himself using a jeweler's loop." At that time, "everything [Ms. Lemoine] observed led [her] to believe that [Mr. Ballow] was fully cognitive and competent and alert." Ms. Lemoine added that "Mr. Ballow was cordial, and nothing [that] was said led [her] to believe that they had not previously discussed and agreed on the deeds." She testified that during the other visit, Mr. Bennett read the deed aloud to Mr. Ballow. Ms. Lemoine testified that "Mr. Ballow appeared to be comprehending" and "asked what would happen to the land if Jack died." When Mr. Bennett responded that his heirs would get the land, "Mr. Ballow asked if that included Cindy," and was pleased when Mr. Bennett responded affirmatively. Ms. Lemoine also testified that "Mr. Ballow appeared to know what the deed was, and it was clear to [her] that Mr. Ballow knew that he was conveying the land to [Mr. Bennett]," and "he appeared happy about that."

Nicki Thornton, a licensed master social worker for the rehabilitation unit at JRMC, also testified. Her duties included assessing patients upon their admission to identify, among

other things, any "barriers they have." Ms. Thornton testified that she assessed Mr. Ballow and "had him sign insurance documents" upon his admission. She said that Mr. Ballow gave her "a lot of background information about himself" and used a jeweler's loop to read documents. Ms. Thornton further explained that "there is a specific procedure for patients in the rehab facility to sign legal documents," and "[t]he patients have to be competent enough to understand what they're signing." She testified that "Mr. Ballow signed Medicare paperwork," and he apparently "understood that he had Medicare" and that he was signing documents that would allow Medicare to pay for his treatment. Ms. Thornton also stated, however, that "any other legal documents cannot be signed by patients [without the approval of] Dr. Frigon, who is the medical director at JRMC rehab."

Ms. Thornton testified that Mr. Bennett apparently bypassed Dr. Frigon on December 31 when Mr. Ballow signed the corrected warranty deed. She recalled that "a couple stopped by [her] office regarding Mr. Ballow, wanting to know of a notary public." She identified the couple as Cindy and Jack Bennett. Ms. Thornton told the Bennetts that "in order for Mr. Ballow to sign documents, [she] would need to contact our medical director so that she could determine whether [Mr. Ballow] was competent to sign." Ms. Thornton also told the Bennetts that a notary public was available at the hospital but "would not sign a document unless Dr. Frigon gave the notary permission to do so."

Ms. Thornton also testified that Mr. Ballow's "rehab team," including her and Dr. Frigon, "felt that Mr. Ballow was not competent[.]" She stated, in fact, that he "was not competent to sign any paperwork whatsoever because he was confused a lot" and "had a

10

problem comprehending a lot of things." Ms. Thornton further testified that she "had to repeat things and tell him things over and over to make sure that he understood," and on some days, "he could not remember who [she] was."

Meghan Capps, a speech pathologist at JRMC, also testified. Ms. Capps explained that she assesses and treats patients "on a large range of things," including "their language skills, expression and comprehension, cognitive skills, memory, problem solving, reasoning, sequencing, organization, swallowing, and voice." Ms. Capps testified regarding the rehabilitation team's assessment of Mr. Ballow, which occurred "sometime between December 28 and December 29." She stated that "[b]ased on [the assessment report], Mr. Ballow had deficits in his thinking and understanding which would make it difficult for Mr. Ballow to understand and comprehend legal documents."

On a scale of one to seven, Mr. Ballow's assessment score for auditory and visual comprehension was four, "which corresponds within minimal assistance or understands 75 percent to 90 percent of the time." He was "within functional limits" for visual comprehension, and he was able to express basic ideas 50 percent to 74 percent of the time, which correlated to requiring "moderate assistance." Mr. Ballow also scored a five on social interaction, and he scored a three on "problem solving," meaning that he solved routine problems 50 percent to 74 percent of the time, again correlating to "moderate assistance." Ms. Capps also testified that Mr. Ballow scored an 18 out of 30 (correlating to moderate impairment) in problem solving on another assessment, the Mini-Mental State Exam, "which is a person's overall cognitive ability."

In light of this data, Ms. Capps opined that Mr. Ballow "would not . . . have the cognitive ability to . . . sign documents." She added that "[i]f someone gave Mr. Ballow a deed giving away his land, [she] would not recommend that [he] sign the deed" because "he presented with moderate levels of impairments with cognitive communication skills," and "a person that scored at the level Mr. Ballow scored . . . would not have been able to make those kinds of decisions." Nonetheless, Ms. Capps also stated that she believed that if she had asked about Mr. Ballow's property, "he would have been able to tell me about his land in Drew County" and "who he wanted his land to go to."

On September 13, 2019, the circuit court entered a decree that set aside both warranty deeds that Mr. Ballow signed in December 2017 as well as a deed in which Mr. Bennett attempted to grant Mr. Ballow a life estate in the forty-nine-acre tract of land in Drew County. The court observed that the "central question" in the case was whether Mr. Ballow was mentally competent when he executed the special warranty deeds.

The circuit court ruled that Mr. Ballow was not competent to "execute either of the special warranty deeds." The court noted Mr. Ballow's performance on the cognitive assessments at JRMC as well the "testimony of other witnesses and [the court's] observation of Mr. Ballow as a witness," which revealed that Mr. Ballow had only a ninth-grade education, was "very hard of hearing," and "often had difficulty understanding the questions presented to him." The court also found that Mr. Ballow has "very poor eyesight" and cannot read without the assistance of magnification from the jeweler's loop that he uses. The court ruled, in summary, that Mr. Ballow was not competent to execute the deeds "based upon [his]

diminished mental capacity, diminished comprehension ability, injuries suffered, advanced age, and the gross inadequacy of the purchase price[.]"

The court also concluded that "Mr. Ballow was unduly influenced by Jack Bennett to sign the special warranty deeds." The court based its ruling on the "long-term relationship" between Mr. Ballow and Mr. Bennett as well as "the assistance provided to Mr. Ballow for several years." The court also noted that the Bennetts are "listed in the JRMC medical records as Mr. Ballow's caretakers." The court was also persuaded by Mr. Ballow's injuries, his mental incapacity, his advanced age, and the "gross inadequacy of the price for the land."

Finally, the circuit court ruled "that an act of constructive fraud occurred in the execution of the special warranty deeds." The court said that it was influenced by "the fact that Defendant, Jack Bennett, circumvented the JRMC procedure for the signing of legal documents by patients and had his niece notarize the special warranty deeds." Also, "the detrimental effect of the special warranty deeds deprived Mr. Ballow of the ownership of his land in his later years of life, without any compensation, and is such an egregious result as to be unconscionable."

The Bennetts now appeal the circuit court's decree, arguing (1) that the circuit court erred as a matter of law because it failed to make specific findings on the separate factual requirements necessary to invalidate a deed on the basis of mental incompetency and because it appears that the circuit court applied the wrong standard for determining Mr. Ballow's competency; (2) that the circuit court erred by preventing the Bennetts from entering the whole of Mr. Ballow's medical records into evidence; (3) that the circuit court erred by

13

finding that Mr. Bennett committed constructive fraud; and (4) that the circuit court erred in finding that Mr. Bennett unduly influenced Mr. Ballow in the execution of the special warranty deeds.[2]

## II. *Standard of Review*

This court reviews traditional equity cases de novo. *Black v. Duffie*, 2016 Ark. App. 584, at 14, 508 S.W.3d 40, 49. The test on review is a clearly erroneous standard (i.e., whether this court can say that the circuit court's findings are clearly erroneous). *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake was made. *Id.* In reviewing a circuit court's findings of fact, this court gives due deference to the circuit court's superior position to determine the credibility of witnesses and the weight to be accorded their testimony. *Id.* Further, this court has also held that where the pivotal issue is the credibility of interested parties whose testimony is in direct conflict, it defers to the circuit court's determination. *Id.*

## III. *Discussion*

### A. Mental Incapacity

---

[2]The Bennetts raise a fifth point in which they argue "to the extent that [Mr. Ballow] may argue that the [circuit] court made a finding of unilateral mistake" those findings are insufficient. We do not see any finding of unilateral mistake, however, in the circuit court's decree. Accordingly, we do not address the Bennetts' fifth point.

"The mental capacity of the maker of a trust or deed is presumed, and the burden rests on the contestants to prove incapacity by a preponderance of the evidence."[3] *Black*, 2016 Ark. App. 584, at 15, 508 S.W.3d at 50. Additionally, "[t]he determination of whether a deed is void because of the mental incapacity of the grantor is measured by his or her mental ability at the time of the execution of the deed." *Id.* "If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what consideration, then he possesses sufficient mental capacity to execute such instrument." *Id.* at 15–16, 508 S.W.3d at 50. "Sufficient mental ability to exercise a reasonable judgment concerning these matters is all the law requires." *Id.* at 16, 508 S.W.3d at 50. "If a person has such mental capacity, then, *in the absence of fraud, duress, or undue influence,* mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him [or her]." *Id.* (emphasis in original).

While Mr. Ballow's mental capacity at the time of the execution of the deed is the focus of the inquiry, proof of his condition before and after the deed's execution may be relevant to his condition at the time the deed was signed. *Noland v. Noland*, 330 Ark. 660,

---

[3]The Bennetts assert that Mr. Ballow was required to come forward with evidence of mental incapacity that is "clear, cogent, and convincing." That is incorrect. The supreme court has expressly rejected that standard in favor of "the less strict quantum of proof" that requires "only a preponderance of the evidence" to establish mental incapacity. *See Watson v. Alford*, 255 Ark. 911, 913, 503 S.W.2d 897, 899 (1974).

670, 956 S.W.2d 173, 178 (1997). The fact that a grantor is old and in feeble health, in fact, is a "circumstance bearing on the question of mental capacity," as is gross inadequacy of price." *Black*, 2016 Ark. App. 584, at 23, 508 S.W.3d at 54. Nevertheless, "[t]he mere fact that an aged [grantor's] memory is failing or that his judgment is vacillating, or that he is becoming eccentric, or that his mind is not as active as formerly—these things do not invalidate [the deed] if it was fairly made and he was free from undue influence." *Noland*, 330 Ark. at 670, 956 S.W.2d at 178. Ultimately, "[e]ach case presenting a question of a grantor's mental capacity is to be decided on its own particular facts and circumstances." *Muzner v. Kushner*, 2010 Ark. App. 196, at 7, 375 S.W.3d 647, 651.

In our view, the circuit court clearly erred to the extent that it ruled that Mr. Ballow's alleged mental incompetence, alone, warranted setting aside the special warranty deeds. While the court noted several concerns about Mr. Ballow's mental capacity, it did not make any finding, as it must, regarding whether he had sufficient capacity to retain the extent and condition of his property, to comprehend how he was disposing of it, the identity of the grantee, or the amount of consideration. *See Black*, 2016 Ark. App. 584, at 15–16, 508 S.W.3d at 50.

Moreover, while the record indicates that Mr. Ballow is hard of hearing, visually impaired, and has moderately diminished cognitive ability, a preponderance of the evidence demonstrates that he was mentally competent when he executed the deeds. Ms. Lemoine, who was present when Mr. Ballow signed both of the deeds, testified that he appeared to comprehend the deeds, asked questions about the disposition of the property after Mr.

16

Bennett's death, and "clearly" knew that he was conveying the land to Mr. Bennett. Additionally, in his testimony at trial, Mr. Ballow was able to relate the details surrounding his purchase of the property, its size, how long he lived there, and its value as a source of timber. Mr. Ballow also related some of the details surrounding the execution of the deeds—most notably Ms. Lemoine's presence—and was also very clear that he did not want Mr. Bennett to have his property. Further, while Ms. Capps testified that Mr. Ballow was assessed as moderately impaired in several areas, and she did not think he could competently sign legal documents conveying his land, she also conceded that "he would have been able to tell me about his land in Drew County" and "who he wanted his land to go to." Accordingly, Mr. Ballow failed to demonstrate by a preponderance of the evidence that he was mentally incompetent when he executed the special warranty deeds.

### B. Exclusion of Medical Records

The Bennetts next assert that the circuit court erred by excluding two proffered medical records, defendant's exhibits 1 and 2, as not properly authenticated. Specifically, they argue that the court erred by accepting Mr. Ballow's argument that the only proper method of authenticating the documents was according to the certification procedure set forth in the Medical Records Act There are other methods of authenticating the records, they say, including through "[t]he testimony of a witness with knowledge that a matter is what it is claimed to be." *See* Ark. R. Evid. 901(b)(1) (2021). According to the appellants, Ms. Capps authenticated the exhibits during her testimony on cross-examination, and the circuit court's erroneous exclusion of the medical records caused them prejudice. While we agree

17

that the records were likely admissible, we hold that the circuit court's decision excluding them does not warrant reversal.

The records, which appear to be nurses' notes systematically describing Mr. Ballow's condition on December 28 and 31, appear in the appellant's addendum at pages 151 and 162, respectively. Both documents were handed to Ms. Capps during her cross-examination by the appellants' counsel. According to the supplemental abstract, Ms. Capps identified the records as "part of the rehab team assessment and intervention" that "[cover] Mr. Ballow while he was in [her] care." She testified, moreover, that both documents appeared to be "a fair and accurate representation" of Mr. Ballow's medical record while he was in her care.

Mr. Ballow objected to the admission of the records because "there is a process for certifying medical records as exhibits," namely the certification procedure outlined in the Medical Records Act, which "[had] not been followed." The circuit court agreed that the documents should be excluded from the record but permitted the appellants to cross-examine Ms. Capps regarding their contents. At the appellants' request, Ms. Capps later read from defendant's (proffered) exhibit 1, which described Mr. Ballow on December 28 as "alert," "oriented," having "spontaneous, well-placed, and logical" speech, and having "behavior appropriate to the situation."

This court reviews a circuit court's evidentiary ruling for an abuse of discretion. *See Hopkins v. State*, 2017 Ark. App. 273, at 3, 522 S.W.3d 142, 144. This court will not find an abuse of discretion, moreover, unless a circuit court acted "improvidently, thoughtlessly, [or] without due consideration." *Milner v. Luttrell*, 2011 Ark. App. 297, at 3, 384 S.W.3d 1, 3.

18

As an initial matter, it is not clear that the circuit court excluded the documents for lack of proper authentication. Mr. Ballow's general objection based on the Hospital Records Act could have touched on the admissibility of the records under the business records exception in Ark. R. Evid. 803(6) (2021), as well as their authenticity. The Hospital Records Act has provisions that address both concerns, *see* Ark. Code Ann. § 16-46-305 (Supp. 2021) & § 16-46-306 (Repl. 1999) (authenticity);*see also* Ark. Code Ann. § 16-46-108 (Repl. 1999) (business records), and the circuit court did not specify either of these as the basis for its ruling.

With that said, we agree that the circuit court erred by excluding the records. The aforementioned provisions from the Hospital Records Act are intended only to streamline the admission of medical records. They provide that custodians may certify medical records as authentic, *see* Ark. Code Ann. § 16-46-305, and kept in the course of a regularly conducted business, *see* Ark. Code Ann. § 16-46-108, by affidavit rather than live testimony. Neither provision directs that a custodian's affidavit is the exclusive means of authenticating medical records or qualifying them for the business-records exception, as the circuit court apparently applied one of them here.

Additionally, Ark. R. Evid. 803(6) (2021) provides that a records custodian "or other qualified witness" may testify that a record is kept in the course of regularly conducted business. Rule 901 provides that a record may be authenticated by the "[t]estimony of a witness with knowledge that a matter is what it is claimed to be." Ark. R. Evid. 901(b)(1) (2021). Ms. Capps did both through her testimony when she recognized the nearly identical

19

documents, described them "fair and authentic" copies of the originals, and stated that she "encountered [them] regularly in [her] job." Therefore, the circuit court erred when it excluded defendant's exhibits 1 and 2 because the Bennetts failed to have them certified in accordance with the Hospital Records Act.

In any event, "[a]n evidentiary error must be prejudicial to justify reversal," *Tanner v. Tanner*, 2015 Ark. App. 668, at 7, 476 S.W.3d 832, 836, and there is no indication that the circuit court's exclusion of the records affected the fairness of the trial. As stated above, the Bennetts were able to elicit the relevant contents of defendants exhibit 1—describing Mr. Ballow's mental status on December 28—through their cross-examination of Ms. Capps. Defendants exhibit 2, describing Mr. Ballow's mental status on December 31, contains nearly identical information. Additionally, the records containing a nurse's observations of Mr. Ballow's mental status on those days, while relevant, hardly have the same probative force as Ms. Capps's testimony about her specialized evaluation of Mr. Ballow or the results of the standardized assessments that she administered. For these reasons, we hold that the exclusion of the records did not cause prejudice warranting reversal.

## C. Constructive Fraud

The Bennetts next argue that the circuit court erred when it found that constructive fraud also warranted setting the deeds aside. According to the Bennetts, Mr. Ballow failed to introduce sufficient evidence on several of the elements required to establish constructive fraud, and correspondingly, the circuit court failed to make adequate findings in its decree.

We agree that the circuit erred to the extent that it found that the special warranty deeds were the products of constructive fraud.

To establish fraud, a plaintiff generally must prove the following elements: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the misrepresentation; (4) justifiable reliance on the misrepresentation; and (5) damage suffered as a result of the reliance. *Worley v. City of Jonesboro*, 2011 Ark. App. 594, at 12, 385 S.W.3d 908, 915.

A person may still commit fraud, however, "even in the absence of an intent to deceive." *Id*. "With constructive fraud, liability is based on representations that are made by one who, not knowing whether they are true or not, asserts them to be true. *Id*. Additionally, "[c]onstructive fraud has been defined as a breach of a legal or equitable duty, which, irrespective or moral guilt on the fraud feasor, the law declares to be fraudulent because of its tendency to deceive others; constructive fraud generally involves a mere mistake of fact." *Id*. "Thus, neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud, and a party's lack of knowledge of the material misrepresentations asserted by him to be true or his good faith in making the representations is no defense to liability." *Id*. at 12, 385 S.W.3d at 915–16.

Further, constructive fraud must be established by clear and convincing evidence, which "is a degree of proof that produces in the finder of fact a firm conviction as to the allegation sought to be established." *Henry v. Mitchell*, 2013 Ark. 246, at 15, 428 S.W.3d 454,

463. On appeal, "the question is not whether [the appellate court] is convinced there was clear and convincing evidence to support the findings of the circuit court, but whether [it] can say the findings are clearly erroneous." *Victory v. Smith*, 2012 Ark. App. 168, at 2, 392 S.W.3d 892,894. That "does not require uncontradicted proof, and [this court] must defer to any credibility determinations made by the [circuit] court." *Id.*

At trial, there was conflicting evidence on the first element: whether Mr. Bennett made a misrepresentation of fact. Mr. Ballow testified that Mr. Bennett told him that the deed would merely allow him to look after Mr. Ballow's property while he was in the hospital. Mr. Bennett, on the other hand, testified that Mr. Ballow himself raised the idea of transferring ownership of his property. The decree does not resolve this conflict or, for that matter, make any finding on many of the remaining elements of constructive fraud. Rather, Mr. Bennett's circumvention of JRMC's procedures for "the signing of legal documents by patients" and the detrimental effect of the transaction on Mr. Ballow (his damages) appear to be the only findings supporting the circuit court's ruling. That, in our view, is error that would warrant reversal of the decree in the absence of any undue influence, which we discuss next.

### D. Undue Influence

The party seeking to set aside the deed on the ground of undue influence must show that he was "deprived of his free will," *Black*, 2016 Ark. App. 584, at 15, 508 S.W.3d at 50 (quoting *Hooten v. Jensen*, 94 Ark. App. 130, 136, 227 S.W.3d 431, 435 (2006)), and he must do so with proof that is clear, cogent, and convincing. *Hankins v. Austin*, 2012 Ark. App. 641,

at 13, 425 S.W.3d 8, 16. Moreover, "[t]he influence that the law condemns is not the legitimate influence that springs from natural affection, but the malign influence that results from fear, coercion, or any other cause that deprives the individual of his free agency." *Black*, 2016 Ark. App. 584, at 15, 508 S.W.3d at 50.

Undue influence may be inferred from the facts and circumstances of the case. *Hooten*, 94 Ark. App. at 136, 227 S.W.3d at 435. The grantor's mental capacity is among the circumstances that should be considered. A grantor's diminished mental capacity may make him or her more susceptible to undue influences; therefore, "the questions of undue influence and mental incapacity . . . can be considered together." *Id.* "In the context of a will, it has been held that, where the mind of the testator is strong and alert, the facts constituting undue influence must be stronger than where the mind of the testator is impaired either by some inherent defect or by the consequence of disease or advancing age." *Id.* (citing *Pyles v. Sayers*, 344 Ark. 354, 360, 39 S.W.3d 774, 778 (2001)).

With these principles in mind, the record in this case supports the circuit court's finding of undue influence. Mr. Ballow's advanced age, injuries, and diminished mental capacity, while perhaps not at a level that warranted a finding that he was mentally incompetent, were significant enough to impair his free will. In addition, it was Mr. Bennett's attorney—and not anyone representing Mr. Ballow's interests—who prepared the deeds, and Mr. Bennett visited Mr. Ballow twice for the purpose of executing them. Mr. Bennett also circumvented JRMC's procedures regarding the signing of legal documents on one of those occasions, and his haste to complete the transaction and the gross inadequacy of the

23

purchase price for valuable timberland further support the circuit court's finding of undue influence. Accordingly, we affirm the decree.

IV. *Conclusion*

We affirm the circuit court's decree setting aside the warranty deeds. While the record does not support the circuit court's findings that the deeds were the product of constructive fraud or that Mr. Ballow lacked mental capacity to execute the deeds, we agree that the evidence supports a finding of undue influence. Further, while we agree that the circuit court erred by excluding the proffered medical records, the appellants have failed to demonstrate that they suffered any prejudice warranting reversal of the decree.

Affirmed.

ABRAMSON and VAUGHT, JJ., agree.

*Gill Law Firm, PLC*, by: *Brooks A. Gill*, for appellants.

*Hashem Law Firm, PLC*, by: *Hani W. Hashem* and *John A. Singleton, Jr.*, for appellee.

24